STATE of Missouri,
Plaintiff-Respondent,

v.

Emmett Clifton NAVE,
Defendant-Appellant.

No. 66379.

Supreme Court of Missouri,
En Banc.

Aug. 7, 1985.
Rehearing Denied Sept. 10, 1985.

Holly G. Simons, Asst. Public Defender, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., Mark A. Richardson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

DOUGLAS W. GREENE, Special Judge.

Defendant, Emmett Clifton Nave, was jury-convicted of capital murder, § 565.-001,[1] in force at the time in question, robbery in the first degree, § 569.020, sodomy (three counts), § 566.060, and kidnapping (four counts), § 565.110. The jury recommended a death sentence on the capital murder charge. The trial court, after finding Nave to be a persistent offender, sentenced him to death for the capital murder conviction, life imprisonment for the robbery, life imprisonment without eligibility for probation or parole for 30 years on each of the sodomy charges, and 30 years' imprisonment for each of the kidnapping convictions, with all sentences to run consecutively.

Our review encompasses all errors enumerated by way of appeal, factual substantiation of the verdicts, and the validity of the death sentence, keeping in mind the precepts of § 565.035 defining our mandated inquiry in death penalty cases.

Although the sufficiency of the evidence to sustain the convictions is not disputed, it is necessary, because of the claim on appeal that the death sentence penalty for the capital murder conviction is excessive and disproportionate to penalties imposed in similar cases, to recast, to some extent, the evidentiary facts surrounding the murder, as well as Nave's attitude and conduct during the time frame in question.

Because of the violent, degrading, and abusive nature of the assaults by Nave on his victims of kidnapping and sodomy, their initials are being substituted for their names in this opinion.

Nave, 43 years old at time of trial, had spent approximately 25 years in penal institutions. He was paroled from the Missouri State Penitentiary on March 14, 1983, where he had been serving two life imprisonment sentences, after 1965 convictions for armed robbery and forcible rape. During that armed robbery, Nave took a woman hostage and later forcibly raped her. He also had a prior history of other felony convictions, including robbery and burglary in the first degree.

Nave and his wife were renting the basement apartment of a dwelling located at 303 Marshall Street in Jefferson City, in which Geneva Roling and her son, Daniel, occupied the first floor. The record does not indicate whether Mrs. Roling was the owner, or the manager, of the apartment house. In the past, Nave had confronted Mrs. Roling about parking space problems, lack of sufficient heat in his apartment, and problems with delivery of his mail.

Nave also was having trouble with his parole officer, Denise Balazic. Two of the conditions of his parole were that he not consume intoxicating beverages and that he attend Alcoholics Anonymous meetings. However, Nave continued consuming intoxicating beverages. He was then admitted into the alcohol abuse program at the Charles E. Still Osteopathic Hospital (hospital) on June 10, 1983, and again on November 14, 1983. On the evening of November 17, Nave had "AMA'd" (left against medical advice) the alcohol detoxification program at the hospital. L.N., a drug abuse counselor at the hospital, instructed Nave to report to his probation officer by 8:00 A.M. the following morning.

On November 18, after learning Nave had been convicted of driving while intoxicated, and was not attending AA meetings,

---

1. Unless otherwise indicated, all references herein to statutes are to Missouri Revised Statutes, RSMo 1978. Section 565.001 was repealed by L.1983, p. 922, S.B. No. 276, § 1. Section 566.060 was amended in 1980, which amendment appears in the 1984 cumulative supplement to the statutes. Section 565.035 also appears in the 1984 cumulative supplement, being enacted in 1983.

Denise told him, "[t]his is the end of the line now, if I find out you've had one drop to drink, if I find out that you're driving your car and you're intoxicated, if you don't go to work, if you miss any AA, whatever, one thing, one altercation—I believe I said: I'll lock your ass up." By this, she meant she would recommend that his parole be revoked. She also advised him that he would be required to swallow an Antabuse tablet in her presence every morning at 8:00 A.M., which drug would make him sick if he took a drink containing alcohol.

That evening, Nave told his wife that Denise and L.N. were "bitches" and that they were "trying to control his life." He was angry because he feared his parole was going to be revoked and "he just felt he was losing everything." During this conversation with his wife, Nave "talked about hurting a lot of people," including Mrs. Roling.

Early the next morning, which was November 19, Nave demanded that his wife drive him to the hospital so that he could attempt to get some drugs. He was carrying the .22 caliber semiautomatic rifle with which he had threatened to kill his wife a few minutes earlier. Before they left for the hospital, Nave said he needed to "talk to the upstairs neighbor," meaning Mrs. Roling. Mrs. Roling's apartment door was separated from the outside door by a hallway. Nave knocked on the outer door, and when they heard Mrs. Roling's apartment door open, Nave told his wife to go to their car. As she was headed to the parking area, Mrs. Nave heard a number of shots, and heard Mrs. Roling scream. She turned around and saw Nave standing in the doorway. Nave then walked to the car, and his wife drove away.

Mrs. Roling's body was discovered by her son, who had stayed with friends the previous night and had returned home shortly after the fatality occurred. She had been shot at least 10 times. Several of the bullet wounds had powder burns, indicating that the murder weapon had been held close to her body when fired. The fatal wound was from a bullet fired into the top of her skull at point blank range. Ballistics tests of shell casings found at the crime scene, spent bullets from Mrs. Roling's body, and bullets fired from Nave's .22 rifle, which was later recovered, indicated that his rifle was the murder weapon.

After killing Mrs. Roling, Nave and his wife drove to the hospital. During the trip, Mrs. Nave asked what had happened to Mrs. Roling and Nave told her not to ask. Upon arriving at the hospital, Nave went to the emergency room, where he was refused pain killing drugs he requested. He returned to the car where Mrs. Nave was waiting and told her that he felt his drug counselor, L.N., had told the nurses not to give him any drugs because he was consuming alcoholic beverages. Nave got the rifle and re-entered the hospital.

Nave went to the alcohol abuse treatment area of the hospital, and approached the nurse's station where L.N., his drug abuse counselor, was talking to a nurse, L.M. He pointed his rifle at the two women and said, "Give me Demerol, I'm tired of all this shit and I want it now." Nave was alert, spoke clearly, and gave no evidence of being under the influence of alcohol or drugs. Upon orders from Nave, L.M. gave him a shot of Demerol. Learning he had been given only 50 milligrams, which is a mild dose, Nave demanded another shot. He told her, "I've already killed two people this morning, I have nothing to lose." After receiving the second dose of Demerol, Nave ordered L.N. and L.M. to put all of the drugs from the narcotics cabinet in a plastic bag, which they did. The taking of the drugs through fear of the use of force constituted the basis for the robbery charge.

At this point, Nave pointed his rifle at the counselor's forehead and said, "I'm going to get you for what you said to Denise Balazic," and demanded she and L.M. leave the hospital with him. On their journey out of the hospital, Nave saw a cardiology department employee, R.K., and E.P., an employee in housekeeping, and ordered

them to also come with him. When E.P. hesitated, Nave told her that, if she did not comply with his orders, he would "drop you where you stand."

Once outside the hospital, Nave ordered the four women to get into his car where his wife was waiting. After questioning each of the hostages as to where they lived, Nave directed his wife to drive to R.K.'s mobile home, which was located near Brazito, Missouri. During the trip, Nave told his hostages that he had already killed two people, and had nothing to lose by killing them all, if they did not do what he said. This abduction constituted the basis for the kidnapping charges.

Upon arrival at R.K.'s home, it was discovered that her keys to unlock the door were in her purse at the hospital. While R.K. attempted to find a way of gaining entry into her home, Nave stuck the rifle in L.N.'s mouth and said, "If they try anything funny, I'll kill you." R.K. broke a window, crawled through it, and unlocked the door to her home from the inside. After the group entered the mobile home, Nave ordered his four hostages to remove their clothing. He then forced L.N., R.K., and L.M., by threatening to kill them if they did not comply, to perform oral sex on him, his wife, and one another. These acts formed the basis for the sodomy charges.

Toward the conclusion of this sordid episode, L.N. and L.M. distracted Nave's attention by pretending they wanted more sexual attention from him. L.N. pushed the rifle, which Nave had laid on the floor near his hand, toward R.K., who grabbed it and tried to shoot Nave. When the gun would not fire, R.K. and E.P. fled, naked and screaming, from the mobile home. L.N. and L.M. also attempted to escape. However, Nave obtained a shotgun belonging to R.K.'s husband which was in the mobile home, and followed. L.M. managed to get away but L.N. tripped and fell. Nave caught her and hit her in the face so hard she blacked out. He dragged her back to the mobile home by her hair, struck her twice with the butt of the shotgun, and told her to get dressed. During this time, he was continuously threatening to kill her.

Nave then ordered L.N. into his car and his wife drove them to a secluded area near a highway maintenance shed where he said he intended to kill L.N. L.N. suggested to Nave that he needed another shot of Demerol and he agreed. After injecting a syringe full of Demerol into his arm, L.N. told Nave that, "I don't think that's quite enough to hold you for as long as you're going to need after you get rid of me." Nave agreed and told her to give him another shot. L.N. obeyed, and Nave quickly became very drowsy from the Demerol overdose. She pushed the shotgun away from his hand. Law enforcement officers converged on the car and took Nave into custody without further incident.

In addition to .22 caliber bullets, a throwing knife was removed from Nave's clothing. The rifle used to kill Mrs. Roling, which had also been used by Nave to threaten to kill the hostages, was recovered and examined. It had a shell in the chamber and nine shells in the magazine.

At trial, there was psychiatric evidence that Nave knew and appreciated the nature, quality and wrongfulness of his actions at the time of the offenses and was able to conform his conduct to the requirements of the law. There was substantial evidence, from Paula Dunn, a friend of Nave's who had spent time with him the evening of November 18, and from the four hostages, that during the late evening of the 18th and throughout the day on the 19th, until he was given the overdose of Demerol immediately before his capture, Nave was not intoxicated, was alert, and spoke clearly.

Nave's defense, presented by his wife during the guilt phase of the trial, and by Nave during the sentencing phase, was that he was so drunk that he did not know what he was doing. This defense evidently was not believed by the jury.

Nave's first point relied on in his brief is that the trial court erred in denying his motion for a continuance, as such denial

left him without adequate time to prepare his defense.

The legal file shows a motion for continuance filed on June 6, 1984. The motion recited, in substance, that defense counsel needed additional time to 1) review Nave's records in the file of the detoxification unit of the hospital, 2) take the deposition of a psychiatrist who had examined Nave, 3) seek expert testimony on the effects of combining Demerol and alcohol, and 4) to "adequately review the voluminous medical records discovered to date."

The state, in its motion opposing the continuance, pointed out that Nave was arraigned on the murder charge on February 17, 1984; that at Nave's request he had been given two mental examinations, one ordered in December of 1983, and the second ordered in February of 1984; that the defense had been in possession of the report of the psychiatrist, whose deposition he now sought, since May 24, 1984, but had not sought to depose him, and that the doctor was available to testify at trial, which was set for June 19, 1984. The motion further alleged that defense counsel had known since November of 1983 that Nave had taken Demerol and had been drinking alcohol on the day the crimes were committed, and had had ample time to obtain any expert they desired to testify on the effects of combining Demerol and alcohol. The motion also pointed out that the records Nave contended he had been unable to obtain were his own medical records that had been available to him since November of 1983.

The prosecuting attorney further asserted the public's right to a reasonably speedy trial, pointed out that the four living victims were receiving professional counseling as a result of their ordeal, that any trial delay would heighten their anxiety, that one of them was pregnant with a mid August 1984 expectancy date, and that any continuance would make her unavailable to testify until late September or early October of 1984.

The trial court heard the matter on June 13, 1984, and after hearing statements from both attorneys, including admissions from defense counsel that he had received all records, reports and transcripts of the depositions he had mentioned in his motion and had consulted with the psychiatrist in question concerning Nave's defense, made the following findings and orders:

The Court finds that there has been a request for a trial setting some sixty days prior to the time the case was set for trial, that due to the nature of the trial, the Court was informed that the request was being made that the four days be set aside for the trial.

The case has been set for trial; the Court wants to be fair to both sides and give the defense every opportunity it has to prepare. The court, in review of the court file, finds that there are some people under subpoena for this trial....

And the Court finds that these people are under subpoena to appear and the State is ready to proceed with trial.

The Court finds that the defense counsel has, as of this date, received all the information that he had previously requested, and the Court believes that all witnesses can be and are available to him to be at the trial, and for that reason, the Court believes that it would be in the best interest of justice that the Motion for Continuance be denied. I will deny the request at this time.

On June 19, when the trial judge inquired if defense counsel was ready for trial, he responded that he was.

After conviction, defense counsel filed a motion for new trial. The denial of the continuance was not alleged as one of the grounds for the motion. Rule 29.11(d)[2] requires that in jury-tried criminal cases, allegations of error, to be preserved for appellate review, must be included in a motion for new trial, except that questions of jurisdiction of the court over the offense charged, questions of whether the indictment or information states an offense, and questions authorized by Rule 27.07 to be

2. Unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R.

presented by motion for judgment of acquittal need not be included in the new trial motion.

■ Denial of a request for a continuance is not one of the exceptions noted in Rule 29.11(d). It has been the law of Missouri for at least 56 years that where denial of a request for a continuance is not assigned as alleged trial court error in a motion for new trial, the appellate court is precluded from reviewing such an assignment of error raised for the first time on appeal. *State v. Cox*, 22 S.W.2d 797, 800 (Mo.1929). *See also, State v. Bailey*, 169 S.W.2d 380, 381 (Mo.), *cert denied*, 320 U.S. 764, 64 S.Ct. 45, 88 L.Ed. 456 (1943).

■ Several states hold that the general rule that allegations of court error not assigned in a motion for new trial are not preserved for appellate review, codified in Missouri in Rule 29.11(d) with exceptions not applicable here, is inapplicable in death penalty cases.[3] Even though the assignment of error has been improperly preserved, we review, ex gratia, the point relied on for plain error, as is provided in Rule 30.20, to determine if manifest injustice or a miscarriage of justice resulted from the denial of Nave's request for continuance. *State v. Glenn*, 429 S.W.2d 225, 236 (Mo. banc 1968).

■ In conducting such a review, we note that the granting or denial of a motion for continuance is within the sound discretion of the trial court. *State v. Jordan*, 646 S.W.2d 747, 753 (Mo. banc 1983). A very strong showing is required to prove trial court abuse of discretion in denial of a motion for continuance, *State v. Cuckovich*, 485 S.W.2d 16, 21 (Mo. banc 1972),

and the party requesting the continuance bears the burden of showing prejudice resulted by such denial. *State v. Haggard*, 619 S.W.2d 44, 46 (Mo. banc 1981), *cert. dismissed*, 455 U.S. 930, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982), vacated and remanded on other grounds, 459 U.S. 1192, 103 S.Ct. 1171, 75 L.Ed.2d 423 (1983).

■ The trial date was set approximately 45 days before the actual trial. The public defender's office had represented Nave since the date of his arraignment on November 21, 1983. Defense counsel was a member of that office. There is no showing in the record that trial counsel was not ready to proceed with Nave's defense on the date of trial. These facts refute the claim of abuse of discretion. Nave has failed to sustain the burden of demonstrating prejudice by the denial of the request for continuance. *State v. Williams*, 652 S.W.2d 102, 109 (Mo. banc 1983).

■ Nave next contends the trial court erred in allowing the state to "death qualify" the jury panel. He alleges that excluding for cause jury panel members who state on voir dire that they cannot, under any circumstances, assess a death sentence, results in a conviction-prone jury, thereby violating his constitutional right to a fair and impartial jury. As legal authority for his position, Nave cites *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985), where a 5–4 majority of that court held that exclusion from jury service during the guilt phase of a bifurcated trial in a murder case, where capital punishment may be assessed in the punishment phase, of persons who state that they would never be able to impose the death penalty, regardless of the

**3.** Arkansas: *Ferguson v. State*, 218 Ark. 100, 234 S.W.2d 990, 991 (1950), where the court held that all exceptions made and ruled upon by the trial court, whether or not included in the motion for new trial, are to be considered on appeal in a capital case; Florida: *State v. Wright*, 224 So.2d 300, 301 (Fla.1969), where the court held that an allegation of insufficiency of the evidence not raised in a motion for new trial is not to be considered except where the defendant is sentenced to death; Louisiana: *State v. Richard*, 203 La. 722, 14 So.2d 615, 616 (1943),

where the court held that in a capital case, it would review the reserved bills of exception even though defendant had failed to file a motion for new trial before appeal; Oklahoma: *Bingham v. State*, 82 Ok.Cr. 5, 165 P.2d 646, 651–652 (1946), where the court held, "in a capital case, all errors alleged to have been committed during the trial of the defendant will be considered whether such assigned errors were presented to the lower court or properly raised by motion for new trial."

circumstances, violated a defendant's constitutional rights.

We are not bound by the majority view expressed in *Grigsby, Rodgers v. Danforth*, 486 S.W.2d 258 (Mo. banc 1972); *State v. Malone*, 694 S.W.2d 723 (Mo. banc 1985), and decline to follow it here for several reasons. First, we have previously rejected such an argument. *State v. Johns*, 679 S.W.2d 253, 265 (Mo. banc 1984), and cases cited therein. Second, the *Grigsby* holding is contrary to the overwhelming weight of state and federal authority, with the latest Supreme Court of the United States opinion contrary to *Grigsby* being *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Finally, when the record in this case is thoroughly examined, it is evident that even under *Grigsby*, the exclusion for cause of the three veniremen in question was proper.

■ Venireman Janowski, on voir dire, stated, "I think I would find it hard to convict somebody, to send them to jail, I'm definitely against capital punishment.... I don't think I would be able to sleep knowing that I put somebody in jail.... Definitely against the death penalty." He also said that his wife was a legal secretary for a defense lawyer and that things she had told him could affect his decision in the case. The trial court found that although Janowski did not say he would not consider the death penalty under any circumstances, the fact that his wife was a legal secretary for a defense attorney and had furnished him with information that could affect his judgment, when combined with his statements about the death penalty, was a legal reason for sustaining the state's request to strike his name from the jury list.

Venirewoman Malinckrodt, when questioned, stated that, "I feel the same way [as Janowski], I have a problem with putting anyone in jail." When the prosecuting attorney inquired as to her ability to put aside that feeling and fairly and impartially weigh the evidence and give the people of the state a fair trial, she replied that "I feel it would interfere." When asked if she thought she could give the state a fair trial, she replied, "No, I do not." She stated she was definitely against the death penalty.

The trial court initially refused to strike for cause Malinckrodt. The state responded, "I wasn't going on the death penalty thing with her, but my notes indicated she said she couldn't give the state a fair trial much earlier before the death penalty question." The defense counsel entered into the conversation with, "I have that note, your Honor, as much as I hate to admit it, I do have it.... She said she could not give the state a fair trial right after Mr. Janowski." The court responded, "For that statement ... I will strike for cause."

Venirewoman McCosh was number 53 on the jury list. The jury panel of 30, plus 6 alternates, was selected from the first 46 names on the jury list, so McCosh would not have been on the panel from which the jury and alternates would be selected, in any event. In addition, she said, "I would not be able to consider the death penalty, period," and that no facts or circumstances could change her mind.

The factual and legal situation existing on this contention is similar to one where a like argument was recently rejected by this court in *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985).

We do not know of, and have not been referred to, any decision of the Supreme Court of the United States, or of the Supreme Court of Missouri, that even remotely suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly stated that they would ignore the law and the instructions of the trial judge, and decide the issue of punishment not on the basis of what the law is, but on the basis of what they think it should be under their own standards. See *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The point has no merit.

■ Nave's third point relied on is that the trial court erred "in assessing the death penalty because the sentencing procedures

of § 565.012[4] were not complied with in that the jury did not find any of the enumerated statutory aggravating circumstances listed in 565.012.2 beyond a reasonable doubt."

Nave alleges that the verdict form returned by the jury leaves doubt as to whether they believed that his past history of burglary, armed robbery, and forcible rape constituted a substantial history of serious assaultive criminal convictions.

The verdict form on the capital murder charge was accepted by the court, after two prior proffered verdict forms recommending the death sentence had been rejected by the trial court. In the opinion of the trial judge, the rejected verdict forms did not sufficiently track the statutory language regarding what constituted an aggravating circumstance, and also, a minor conflict existed in the instructions given the jury in that one instruction required a finding of aggravating circumstances (plural), while the other required a finding of an aggravating circumstance (singular). This technical error was corrected by the trial court before the final verdict was returned, which read as follows:

> As to Count I, we, the jury, having found the defendant guilty of the capital murder of Geneva Roling, fix the defendant's punishment at death, and we designate the following aggravating circumstance or circumstances which we find beyond a reasonable doubt:
>
> The defendant has a substantial criminal history, including convictions for burglary, armed robbery, and forcible rape. The defendant has received two life sentences and has spent most of his adult life in prison. In addition, the defendant, although being released on parole twice, has violated his parole in both cases. Furthermore, the defendant has been convicted of kidnapping, robbery, sodomy, and capital murder.
>
> All of these circumstances have demonstrated to the jury that the defendant is a habitual criminal offender who has made no serious effort to conform to the

laws of society and has shown little, if any, respect for the dignity and well being of his fellow human beings.

> Finally, the defendant's history has shown an increasingly violent pattern, from armed robbery to forcible rape, which has now culminated in the capital murder of Geneva Roling.
>
> /s/ Lynn M. Lamphear
> Foreman

The jury was specifically instructed, by Instruction No. 27 (MAI–CR2d 15.40), that in determining punishment they had to unanimously determine whether Nave had a substantial history of serious assaultive convictions and, if so, whether such history was an aggravating circumstance. Instruction No. 31 (MAI–CR2d 15.48) did not require that the jury write into their verdict on the verdict form that Nave's prior convictions of armed robbery and forcible rape were "serious assaultive convictions." Neither does the approved verdict form (MAI–CR2d 15.56), which was used here, require a finding of prior "serious assaultive convictions."

While the written finding of the jury in the verdict form did not use the precise language used in Instruction No. 27, in determining what the aggravating circumstance was that justified the imposition of the death penalty, their intent, as expressed in the verdict form, is clear, and sufficiently recited all of the essential elements of the statutory aggravating circumstance submitted. We do not find any error in the instructions, or in the verdict form on this issue.

Nave next contends that a) the state did not prove, beyond a reasonable doubt, any constitutionally valid statutory aggravating circumstance, which finding is a prerequisite to a determination that a death sentence should be imposed, and b) that the death sentence imposed was excessive and disproportionate to the penalty imposed in similar cases, because his alleged extreme emotional disturbance and state of intoxication at the time of the killing of Mrs. Roling sufficiently mitigated the crime so as to preclude capital punishment.

---

4. Section 565.012 repealed by L.1983, p. 923, S.B. No. 276, § 1.

In regard to the first contention, Nave asserts that the single statutory aggravating circumstance found (substantial history of serious assaultive convictions) lacks constitutional validity, and the term "substantial history" is impermissibly vague, citing *Arnold v. State*, 236 Ga. 534, 224 S.E.2d 386 (1976), as authority for this position. While *Arnold* so holds, it is not binding upon this court.

 In our opinion, the correct view is expressed in *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876, 879, *cert. denied*, 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198 (1977). *Holtan* holds, after considering in that case the same argument made here, and construing a statute markedly similar to our § 565.012,[5] that the meaning of the term "substantial history" is reasonably clear, and refers to past acts of terror of a criminal nature. *See also*, the concurring opinion of Higgins, J., in *State v. Stokes*, 638 S.W.2d 715, 725 (Mo. banc 1982), *cert. denied*, 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983), where Judge Higgins declares *Arnold* is not persuasive, and states that while a finding of "substantial history" requires subjective analysis, so does a jury's collective understanding of such terms as reasonable doubt, and that the mere fact that the phrase is not measurable with mathematical precision does not render it impermissibly vague. This court, in *State v. Laws*, 661 S.W.2d 526, 532 (Mo. banc 1983), *cert. denied*, ─── U.S. ───, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984), found nothing constitutionally unfair in a death sentence case based, in part, upon a jury finding that the defendant had a substantial history of serious assaultive convictions. We reject Nave's argument based on the decision in *Arnold*.

 In the final part of his argument contending lack of evidence beyond a reasonable doubt to prove the aggravating circumstance of a substantial history of serious assaultive criminal convictions, the evidence shows that during the sentencing phase of the trial, the state introduced cer-

tified copies of court records showing that Nave had been convicted of robbery in 1960, armed robbery in 1965, forcible rape in 1965, and first degree burglary in 1979. The state also introduced evidence that Nave had been paroled in 1978 from the two life sentences he was serving on the 1965 rape and robbery charges, which parole was revoked after the 1979 burglary conviction, and was again paroled in 1983.

Nave testified at the sentencing hearing. He admitted the prior convictions, and testified that during the 1965 armed robbery, he took a female hostage whom he later forcibly raped. If this evidence does not establish, beyond a reasonable doubt, a substantial history of serious assaultive convictions, we are at a loss to envision what would. The evidence was sufficient to establish the statutory aggravating circumstance.

 Nave's final claim is that the death penalty for his capital murder conviction was excessive and disproportionate to penalties imposed in similar cases because of mitigating circumstances. We have carefully reviewed the record, and find no credible evidence of such. While Nave told the jury that he had a serious drinking problem, and that he was so drunk during the time frame of the murder, kidnappings, and sodomies that he did not know what had happened, the four hostages testified that he was not intoxicated on the morning in question, and that he was clear and alert until he was given the final injections of Demerol, which was after all of the crimes with which he was charged were consummated.

The overwhelming weight of the evidence shows a merciless killing of an innocent woman by a man who was angry at his alcohol abuse counselor and his parole officer. He knew that he was probably on his way back to prison, and decided to get even with those who, like Mrs. Roling, had previously crossed him, reasoning "what have I got to lose?" The fact that he knew

---

5. The Nebraska statute, § 29–2523(1)(a), RRS 1943, reads, in defining one species of statutory aggravating circumstance "the offender was previously convicted of another murder or a crime

involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity."

he was facing reincarceration for two life sentences did not deter him from knocking on Mrs. Roling's door and when she answered it, greeting her with a murderous fusillade of 10 or 11 bullets, with the fatal shot being fired into her brain at point-blank range. The threat of additional prison time for the killing of Mrs. Roling and the committing of the monstrous indignities inflicted upon the helpless hostages seemingly was of no consequence to Nave. The imposition of still another life sentence for the murder of Mrs. Roling would serve no purpose, other than to signal to other prisoners and parolees who have received life sentences, that there is no real penalty for committing crimes of the nature displayed here. *State v. Bolder*, 635 S.W.2d 673, 690 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

It is evident from the jury's findings that they wished to send out a message to felons on parole from sentences for crimes of a serious assaultive nature that they will pay the ultimate price for a senseless, brutal murder committed while on parole. The jury's findings in support of their verdict of death for commission of the crime of capital murder were justified under the evidence.

We have surveyed a number of cases of similar nature, some of which are *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Newlon*, 627 S.W.2d 606 (Mo. banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. Bannister*, 680 S.W.2d 141 (Mo. banc 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985); and, *State v. Stokes*, 638 S.W.2d 715 (Mo. banc 1982), *cert. denied*, 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983). After such survey, and a complete review of the record, including defendant's claims of error, we conclude that 1) the judgment of conviction on all counts is supported by the record and is not based on any trial court error, 2) the death sentence imposed for the capital murder conviction was not imposed under the influence of passion, prejudice, or any other arbitrary factor, 3) the evidence supports the jury's finding of a statutory aggravating circumstance, as enumerated in § 565.012.2, and 4) the sentence of death is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime, the strength of the evidence, and the conduct of the defendant.

The judgments and sentences of the trial court for Nave's convictions of the crimes of capital murder, first degree robbery, four counts of kidnapping and three counts of sodomy are affirmed.

HIGGINS, C.J., and BILLINGS, WELLIVER and RENDLEN, JJ., concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

ROBERTSON, J., not participating because not a member of the Court when cause was submitted.

BLACKMAR, Judge, concurring in part and dissenting in part.

I do not believe that the form of the verdict is legally sufficient to authorize the imposition of a death sentence. Section 565.008 (now repealed) provided as follows:

\* \* \* \* \* \*

4. ... The jury, if its verdict is a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt.

\* \* \* \* \* \*

The statutory aggravating circumstance relied on is as follows:

\* \* \* \* \* \*

2. (1) ... the offense was committed by a person who has a substantial history of serious assaultive criminal convictions;

\* \* \* \* \* \*

The only portion of the verdict which responds to this aggravating circumstance reads as follows:

The defendant has a substantial criminal history, including convictions for burglary, armed robbery, and forcible rape.

The jury made no express finding of "serious assaultive convictions" and included in the verdict a conviction for burglary which cannot be properly described as "assaultive." If the state is to exact the death penalty, procedures should be strictly followed and the verdict should be literally precise. The omission of a single word may be fatal to the prosecution's cause. *State v. Gilmore*, 650 S.W.2d 627 (Mo. banc 1983). The verdict did not meet the statutory standard. It matters not that no specific command of MAI–CR2d may have been violated.

Because of the position I take it is not necessary to discuss other issues in any detail. I concur in all other respects with the principal opinion. Extended analysis of *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985) is not necessary because the two jurors who might have served indicated reluctance to "put somebody in jail," and so were properly excludable for the guilt-innocence phase. *Compare State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985). *See* my Concurring Opinion in *State v. Malone*, 694 S.W.2d 723 (Mo. banc 1985). I also agree that the court was justified in correcting the perceived errors in instruction, but see some inconsistency in requiring the trial judges in other criminal cases, and in civil cases, to remain silent as robots when confronted with jurors' questions showing legitimate concern about instructions.

The death penalty was appropriately submitted to the jury. The State is entitled to a new trial of the punishment phase if it desires. I would affirm the conviction for capital murder but would remand for a new trial of the punishment phase. The State of course could waive the death sentence, in which case it would be appropriate for the court to sentence the defendant to the mandatory life term with a minimum of 50 years.

DONNELLY, Judge, dissenting.

In *State v. Brizendine*, 445 S.W.2d 827 (Mo. banc 1969), the majority of this Court noted 28 U.S.C. 2254 (the Federal Habeas Corpus Act) and advised the people of Missouri that its effect is to make this Court subservient to all courts of the United States in cases involving violations of the criminal laws of Missouri.

Since *Brizendine*, and despite persistent urging after publication of Alexander M. Bickel's *The Morality of Consent* in 1975, the majority of this Court has refused to repudiate the arrogations of *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

In this circumstance of self-imposed impotence, this Court, *in criminal cases where violations of the United States Constitution are alleged,* should withdraw from consideration of such cases until review by federal courts of such issues has been exhausted.

In any event, the posturing in this case reference *Grigsby* serves no useful purpose.

I respectfully dissent.