STATE of Missouri,
Plaintiff–Respondent,

v.

Gerald SMITH, Defendant–Appellant.

No. 69852.

Supreme Court of Missouri,
En Banc.

July 26, 1988.

Rehearing Denied Sept. 13, 1988.

Nancy A. McKerrow, Office of Public Defender, Columbia, for defendant-appellant.

William L. Webster, Atty. Gen., L. Timothy Wilson, John M. Morris, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

WELLIVER, Judge.

Appellant, Gerald Smith, was convicted of first degree murder, § 565.020, RSMo 1986. After finding aggravating circumstances as required by § 565.030.4, RSMo 1986, the jury imposed a sentence of death. Appellant appeals from the conviction and sentence.

This Court has exclusive appellate jurisdiction in all cases in which the penalty of death is imposed. Mo. Const. art. V, § 3.

We affirm both the judgment and the sentence.

## I

The sufficiency of the evidence is not in dispute. The evidence is presented in the light most favorable to the verdict.

Appellant,[1] Frank Joseph Guinan,[2] and the victim Robert Baker[3] were all under sentence of death and inmates residing in Housing Unit 3–C at the Missouri State Penitentiary, Jefferson City, Missouri. Housing Unit 3–C is commonly referred to as "death row." Housing unit 3–C is divided into two separate walks, 3–CB and 3–CC. Each walk consists of a row of cells, with each cell opening onto an inner walk. Outside this inner walk, and separated from it by bars, is an outer walk. Access from the inner walk to the outer walk is through two separate security gates that are manually locked by the guards. A "law cage" is accessible from the C-side outer walk and separated by the two security gates from the C side inner walk. The "law cage" is a small room with a locked door where inmates can go to work on their legal cases or someone else's legal case. The outer walk is accessible through a locked gate from a lobby area which separates the B side from the C side.

On November 29, 1985, appellant and Emmett Nave,[4] another death row inmate, were selected as "walk men" for the C wing of Housing Unit 3–C. "Walk men" are selected daily and are permitted out of their cells to pass out meals, sweep the walks, pick up trash and do any other necessary cleaning. Nave asked corrections officer Edward Boyle for permission to consult with Baker in the law cage. Boyle went to see Baker, who resided on B-side, and inquired whether he wished to see Nave. Baker agreed, and also asked to see

1. *State v. Smith,* 649 S.W.2d 417 (Mo. banc), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

2. *State v. Guinan,* 665 S.W.2d 325 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Guinan,* 732 S.W.2d 174 (Mo. banc), *cert. denied.,* — U.S. —, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987).

3. *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983).

4. *State v. Nave,* 694 S.W.2d 729 (Mo. banc 1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986).

Robert Driscoll,[5] who was housed on the C-side. During this time, appellant and Nave were out performing their walk men chores. Upon returning to the C-side to arrange for the legal visit, Boyle let inmate Robert O'Neal[6] out of his cell to shower. The shower is located between the first and second security gates on the inner walk. Prior to letting O'Neal out, appellant and Nave were ordered back to their cells.

Boyle then returned to B-side to get Baker. Another officer handcuffed Baker behind his back and brought him out of his cell. Boyle pat searched him, and found no weapons and brought Baker to the C-side and put him in the law cage and removed his handcuffs. Nave also went into the law cage. At this time, appellant was out on the walk. Before Driscoll was permitted to join Baker and Nave, Boyle ordered appellant to step into his cell, and O'Neal to close the shower door. Appellant complied and Driscoll was placed in the law cage. Boyle then allowed appellant and Guinan out of their cells. Guinan asked to replace Nave as walk man while Nave was in the law cage.

At approximately 10:00 a.m., while Baker, Nave and Driscoll were in the law cage, an officer came into the housing unit to obtain Roy Roberts,[7] and to escort him to a different location in the prison. As a security measure, appellant and Guinan were directed to return to their individual cells. Appellant and Guinan complied with the officer's direction. The doors to appellant's and Guinan's cells were not locked. Roberts was subsequently handcuffed and removed from his housing unit. Boyle then went over to B-side to attend to another matter.

Shortly thereafter, Baker informed the correctional officers that he wished to return to his housing unit. Boyle and another officer, Charles Wautelet, then went over to C-side to take Baker and Driscoll back to their cells. As he entered the outer walkway to C-side from the lobby area, Boyle noted that the outer security gate leading to the inner walk was shut, but did not check it. Boyle said he previously left it open to allow the walk men to clean the outer walk. Boyle stated that he saw Guinan standing directly in front of that door, with appellant close behind. When Wautelet came back to the C-side, he saw Guinan standing more in the corner, and did not see appellant.

Boyle handcuffed Baker and Driscoll behind their backs through the locked law cage door. Nave was not handcuffed because he was to resume his duties as a walk man. Wautelet unlocked the door. As Boyle swung the door open, he felt something on his left shoulder. As he was turning back he realized that appellant and Guinan had come through the gate and were in the typing cage stabbing Baker. According to Wautelet, as Guinan rushed past him and went into the law cage he hollered something about a ring and he hollered for appellant to come in and assist him. Appellant knocked Wautelet to the floor on his way into the law cage. Driscoll and Nave were already out of the cage so Boyle shut the law cage door and Wautelet padlocked it while hollering for appellant and Guinan to stop. Wautelet blew his whistle, and went into the lobby to telephone the control center as appellant and Guinan continued to stab and kick Baker. According to Boyle, appellant stabbed Baker at least thirty times. Wautelet returned with Sergeant Baysinger and Officer Brizendine and the attack on Baker slowed. Four more officers arrived and, after some hesitation and further kicking, Guinan and then appellant passed their weapons out.

Baker was lying in a pool of blood gasping for breath. He was taken to the prison hospital, but he died shortly after arrival.

**5.** *State v. Driscoll,* 711 S.W.2d 512 (Mo. banc), *cert. denied,* 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).

**6.** *State v. O'Neal,* 718 S.W.2d 498 (Mo. banc 1986), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987).

**7.** *State v. Roberts,* 709 S.W.2d 857 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986).

Baker had been stabbed over 50 times. Some wounds were six inches deep. Baker died as a result of multiple stab wounds causing internal injuries, mainly to the lungs.

In a videotaped deposition taken of appellant on April 16, 1986, appellant stated that he spoke to Baker, who was then in the law cage, concerning a ring belonging to Guinan. After Baker replied "fuck you," appellant went to his cell and got his weapon. He waited until the guards opened the law cage and he went in after Baker, stabbing him at least thirty times. Appellant also admitted at trial to stabbing Baker.

During the assault, appellant and Guinan cursed and screamed, with Guinan accusing Baker of stealing his ring. Subsequent to the assault, as the correctional officers began to reassert control over the inmates and appellant was relinquishing possession of his weapon, appellant screamed, "let the fucking nigger die." At no time before, during or after appellant's assault upon Baker did appellant exhibit any sign of alcohol intoxication.

The jury found appellant guilty of first degree murder. At the punishment phase, of the trial, the jury found the following aggravating circumstances: (1) that appellant was convicted of murder on August 13, 1981 in the Circuit Court of St. Louis City of the State of Missouri, § 565.032.2(1), RSMo 1986; (2) that the murder involved torture or depravity of mind and as a result thereof it was outrageously or wantonly vile, horrible or inhumane, § 565.032.2(7), RSMo 1986; and (3) that at the time of the murder, appellant was in the lawful custody of the Missouri State Penitentiary, § 565.032.2(9), RSMo 1986.

## II

Appellant argues that the trial court erred in overruling appellant's motion to quash the indictment and in sentencing appellant to death because the death penalty statute was unconstitutional both facially,

and as applied to appellant under the Eighth and Fourteenth amendments to the United States Constitution and Article I, Sections 2, 10, 18(a) and 21 of the Missouri Constitution.

Our decision in *State v. Bolder*, 635 S.W. 2d 673, 680 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983) answers appellant's contentions. In addition, the claim is without merit because appellant does not indicate how the death penalty statute violates the rights of the accused in a criminal prosecution.

## III

■ Appellant also argues that this Court's refusal to consider all similar cases while conducting its statutorily mandated proportionality review denies him due process, and is ineffective in protecting against the arbitrary and capricious infliction of the death penalty. We previously addressed this issue in *State v. Bolder*, 635 S.W.2d 673, 684–85. *See also State v. Schneider*, 736 S.W.2d 392, 397 (Mo. banc 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). The trial court did not err.

## IV

■ Appellant argues that the trial court erred in overruling appellant's motion to quash the indictment and in sentencing appellant to death because § 565.020, RSMo 1986, violates the Eighth and Fourteenth amendments to the United States Constitution and Article I, Section 21 of the Missouri Constitution in that it allows too much prosecutorial discretion in selecting those cases in which to seek the death penalty, particularly when the accused and victim were inmates, thereby permitting the death sentence to be imposed in an arbitrary and capricious manner.

Appellant claims that in cases like his, the facts establishing guilt of the charged offense also establish the presence of two statutory aggravating circumstances, § 565.032.2(9), (13),[8] RSMo 1986, and there-

8. Section 565.032.2(13), RSMo 1986, that "the murdered individual was an inmate of such

institution or facility [of the department of cor-

fore shifts more discretion from the jury to the prosecutor. Appellant suggests that prosecutorial discretion should be circumscribed by legislatively imposed criteria.

We have repeatedly rejected arguments challenging prosecutorial discretion. *State v. Clemmons*, 753 S.W.2d 901 (Mo. banc 1988); *State v. Walls*, 744 S.W.2d 791, 800 (Mo. banc 1988). The trial court did not err.

## V

■ Appellant contends the trial court erred in sustaining the state's challenge for cause to venireperson Mary Enloe based on her views on the death penalty. Appellant claims this ruling denied him a full panel of qualified jurors in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, section 18(a) of the Missouri Constitution.

The trial court is afforded wide discretion in matters of challenges for cause. *State v. Leisure*, 749 S.W.2d 366, 374 (Mo. banc 1988). "The trial court maintains a far superior position to interpret and evaluate the totality of a venireman's answers and demeanor than an appellate court." *Leisure*, 749 S.W.2d at 374. The trial court's decision should not be disturbed on appeal except for abuse of discretion. *State v. O'Neal*, 718 S.W.2d 498, 502 (Mo. banc 1986), *cert. denied*, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987).

A venireperson should be struck for not considering the death penalty if his views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).

Initially, Enloe did not respond to a general death qualification question posed to the entire panel, but later equivocated on whether she could impose the death penalty. Enloe told the prosecutor that she was not opposed to capital punishment, but "[i]t takes on a little bit different perspective when I'm sitting on the jury that is going to make that determination." Enloe stated twice she could consider the death penalty, but was equivocal whether she could make that determination. Upon examination by appellant's trial counsel, Enloe stated she could follow an instruction that would ask that the jury consider factors and make a decision on the appropriate punishment, but again, Enloe stated "it would take on a different connotation when you start talking about the death penalty." The trial court then asked the following:

THE COURT: Is this a situation, Mrs. Enloe, no matter what the evidence was you just really couldn't see yourself assessing the death penalty; is that a fair statement?

VENIREPERSON ENLOE: That probably is it. I don't think that the evidence would—you know, I think I could deal with the evidence in this trial just as easily as I could the next trial or another one, I think it would be probably the bottom line.

Neither party questioned Enloe any further on this issue. The trial court sustained the state's challenge for cause based on Enloe's position on the death penalty.[9]

Appellant claims Enloe's ability to determine appellant's guilt, the appropriate punishment or follow the court's instructions was not impaired by her views on the death penalty. Appellant argues that the trial court improperly based its decision on Enloe's final answer, and not the entire voir dire. Appellant also claims the trial court's question was improper in that it tried to get her to speculate on a verdict, like *State v. Pinkston*, 79 S.W.2d 1046 (Mo.1935).

rections and human resources];" was not submitted in the jury instruction.

9. Venireperson Enloe also expressed doubts whether she could judge the credibility of an anticipated defense witness, Emmett Nave, according to the instructions because of her knowledge of the circumstances of Nave's conviction. *See State v. Nave*, 694 S.W.2d 729 (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986). Neither party raised this issue before the trial court, nor did the trial court base its decision on this issue.

Enloe was equivocal and the trial court's question and Enloe's response clarified her position that she probably could not assess the death penalty *no matter what the evidence*. The question was proper investigation to determine Enloe's views on the death penalty, regardless of any specific circumstances. Cf. *State v. Antwine*, 743 S.W.2d 51, 59–60 (Mo. banc 1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). There will be situations in which the trial judge is left with the impression that a juror would not follow the law. *Witt*, 469 U.S. at 424–26, 105 S.Ct. at 852–53. The trial judge had an opportunity to observe her demeanor and did not abuse his discretion. *See also, State v. Jones*, 749 S.W.2d 356 (Mo. banc 1988).

### VI

■ Appellant contends the trial court erred in admitting five photographs depicting the victim's condition because they were cumulative, gruesome and inflammatory and therefore denied him a fair trial under the Sixth and Fourteenth amendments to the United States Constitution.

The trial court has broad discretion in determining the admissibility of photographs. *State v. Clemmons*, 753 S.W.2d 901, 907 (Mo. banc 1988); *State v. Pollard*, 735 S.W.2d 345, 348 (Mo. banc 1987), *cert. denied,* — U.S. ——, 108 S.Ct. 733, 98 L.Ed.2d 682 (1988); *State v. Guinan*, 665 S.W.2d 325, 331 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Photographs are "relevant to show the scene of the crime, the identity of the victim, the nature and extent of the stab wounds to the victim, [and] the cause of death ...," *Guinan*, 665 S.W. 2d at 331, or enable the jury to understand the testimony, *Clemmons*, 753 S.W.2d at 907.

The trial court admitted the photographs because they showed the nature, location and apparent severity of the wounds. "Insofar as these photographs are unpleasant, it is a reflection of the nature of the crime." *Pollard*, 735 S.W.2d at 348. The trial court did not abuse its discretion.

### VII

■ Appellant claims the trial court erred in failing to declare a mistrial because of a statement made by the prosecutor during closing argument in the punishment phase. Appellant claims this error violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 21 of the Missouri Constitution.

During closing argument, the prosecutor made the following statement in reference to appellant's previous conviction for the murder of Karen Roberts: "Another jury has sentenced this man to death. They had to weigh through the evidence in that case, they had to consider the same kind of evidence that you have to consider in the murder of—".

Appellant objected to the prosecutor's remarks and asked that the jury be admonished and for a mistrial. The trial court sustained appellant's objection, denied appellant's request for a mistrial and instructed the jury to disregard the previous argument made by the prosecutor. Appellant argues that he was denied his right to be free from cruel and unusual punishment, a reliable determination of punishment, that such an argument tended to lessen the jury's sense of responsibility to determine the appropriate punishment and that the argument could have misled the jury to believe appellant killed another death row inmate prior to this case.

" '[T]he declaration of a mistrial is a drastic remedy, and the power of the trial court in this respect should be exercised only in extraordinary circumstances.' " *State v. Young*, 701 S.W.2d 429, 434 (Mo. banc 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986), (quoting *State v. Camper*, 391 S.W.2d 926, 927–28 (Mo.1965)). "The trial court is afforded wide discretion in determining the scope of counsel's argument to the jury and unless an abuse of discretion is demonstrated, to the prejudice of the accused, the case will not be reversed on appeal." *State v. Wood*, 596 S.W.2d 394, 403 (Mo. banc), *cert.*

*denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980).

The jury was well aware that appellant was already housed on death row. The jury was also instructed that it was their primary responsibility to fix punishment. The trial judge did not err in denying a mistrial.

## VIII

■ Appellant contends the trial court erred in the punishment phase by refusing to submit appellant's Instruction A to the jury. The proposed instruction would have enumerated nonstatutory mitigating circumstances relating to appellant's character and the offense. Appellant claims the trial court's ruling denied his right to individualized sentencing under the Eighth and Fourteenth Amendments to the United States Constitution.

Appellant offered the following instruction:

### INSTRUCTION NO. A

If you decide that one or more sufficient aggravating circumstances exist to warrant the imposition of death, as submitted in Instruction No. 15, you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider all of the evidence relating to the murder of Robert Baker.

You may also consider:

1. Whether [t]he murder of Robert Baker was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Whether [t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. Whether [t]he State of Missouri, through the negligence of its employees at the Department of Corrections, created a situation that placed the defendant in danger from other inmates.

4. Whether [t]he State of Missouri, through the negligence of its employees at the Department of Corrections, acted to create the circumstances that led to the death of Robert Baker.

5. Whether Robert Baker had previously threatened the defendant, and was known to the defendant as a violent person who had been convicted of Capital Murder for the killing of a law enforcement officer.

6. Whether [t]he defendant had previously stabbed [sic] while on death row and knew from experience that the employees of the Department of Corrections could not protect him from other inmates.

7. Whether [t]he defendant showed a sense of conscience and morality in that, despite having every opportunity to do so, he did not harm or attempt to harm either unarmed guard present at the scene of the offense.

You may also consider any circumstances which you find from the evidence in mitigation of punishment.

If you unanimously find that one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

The trial court refused appellant's Instruction A and gave the following instruction:

### INSTRUCTION NO. 16

If you decide that one or more sufficient aggravating circumstances exist to warrant the imposition of death, as submitted in Instruction No. 15, you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider all of the evidence relating to the murder of Robert Baker.

You may also consider:

1. Whether the murder of Robert Baker was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

You may also consider any circumstances which you find from the evidence in mitigation of punishment.

If you unanimously find that one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

Appellant was not denied the opportunity to present any mitigating evidence. Appellant argues that § 565.032.1(3), RSMo 1986 and MAI–CR3d 313.44 require submission of the offered mitigating circumstances because they were "otherwise authorized by law and supported by the evidence." Appellant conceded at oral argument that nonstatutory mitigating circumstance No. 5 offered by appellant was not supported by the evidence.

In *State v. Leisure,* 749 S.W.2d 366 (Mo. banc 1988), the defendant offered a similar instruction related to his character and background. In that case, we stated:

In *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985), appellant offered a substantially similar instruction for use in the punishment phase. This Court determined that Note on Use 5 of MAI–CR2d 15.44 decided the issue and that the trial court did not err in refusing the proffered instruction. Note on Use 5 reads:

The jury may consider extenuating or mitigating circumstances even though not set out as "statutory" mitigating circumstances in Section 565.012.3 and even though not "authorized by law" within the meaning of that phrase discussed in 4 above. However, **no in-**

**struction should be given calling the jury's attention to any particular circumstance referred to in general in this paragraph.**

[Emphasis added.] In *Young,* this Court held that the language in the instruction offered by appellant referred to particular circumstances within the meaning of Note on Use 5, "which the jury could have considered, but upon which the jury should not have been instructed." 701 S.W.2d at 437.

*Leisure,* 749 S.W.2d at 380.

Appellant disagrees with *Young,* and claims that he is not entitled to set forth a nonstatutory mitigating circumstance only if it comes within the meaning of any statutory mitigating circumstance. Appellant's instruction is similar to that in *Young* and *Leisure.* Our decisions in *Young* and *Leisure* control. The trial court did not err in refusing appellant's instruction A.

## IX

◾ Appellant contends that the aggravating circumstance that the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind," § 565.032.2(7), RSMo 1986, is unconstitutionally vague on its face and as applied here under the Eighth and Fourteenth amendments to the Constitution of the United States.

The jury found three aggravating circumstances:

(1) Whether the defendant was convicted of murder on August 13, 1981, in the Circuit Court of St. Louis City of the State of Missouri;

(2) Whether the murder of Robert Baker involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhumane; [10]

(3) Whether at the time of the murder of Robert Baker, the defendant was in the lawful custody of the Missouri State Penitentiary.

10. This jury instruction differs from the one offered in *Newlon v. Armontrout,* 693 F.Supp. 799 (W.D.Mo.1988), where "torture" was not included in the jury instructions.

Our decision in *State v. Griffin*, 756 S.W. 2d 475 (Mo. banc 1988), handed down contemporaneously herewith, addresses the same issue raised by appellant. We stated:

that at least one of the factors set out in *Preston* must be present before a finding of depravity of mind will be found to be supported by the evidence. This limiting construction of the depravity of mind aggravating circumstance is sufficiently definite to provide a principled means to distinguish cases in which the death penalty is imposed from those in which it is not.

In *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), this Court stated:

In following the mandate of *Godfrey* to establish "clear and objective standards" as to what types of murders constitute "depravity of mind," this court, while not expressly adopting a precise definition, has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

*Griffin* also stated:

To further elaborate on *Preston*, the "brutality of defendant's conduct" and the "nature of the crime" factors which will be found to justify a finding of depravity of mind mean that the murder must involve serious physical abuse. For example, evidence that the murder victim or other victims at the murder scene were beaten or evidence that numerous wounds were inflicted upon a

victim will support the aggravating circumstance. The "mental state of defendant" factor means that the defendant must have acted with callous disregard for the sanctity of life as, for instance, where the defendant plans a robbery with the intent to kill all witnesses and has no apparent moral compunctions about such a course of action or where the victim was killed while helplessly bound, after being otherwise incapacitated, or after complying with all of defendant's demands without resistance.

The evidence supports the jury finding of torture or depravity of mind. The victim suffered over 50 stab wounds, inflicted with homemade weapons, some of which were six inches deep. Appellant also uttered a racial slur to "let the fucking nigger die." The victim was still alive when he was brought to the prison hospital. Section 565.032.2(7), RSMo 1986, is not unconstitutionally vague on its face or in its application to this case.[11]

## X

We now turn to our statutory mandated review of the imposition of the death sentence. § 565.035.3, RSMo 1986.

We are required to decide whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. After independent review, we conclude that there is no evidence that the death sentence was imposed under the influence of passion, prejudice or other arbitrary factor.

The jury found as aggravating circumstances that appellant had a prior conviction for capital murder and that the murder was committed by a person in lawful confinement. These aggravating circumstances are not disputed. There is sufficient evidence to support the findings of these aggravating circumstances. Appellant disputes the validity of the aggravating cir-

11. "Our cases consistently hold that if the jury properly finds a single statutory aggravating circumstance, then a finding of another one is not prejudicial even though not supported by the evidence or otherwise infirm." *State v. Jones*, 749 S.W.2d 356, 364 (Mo. banc 1988) (footnote omitted). *See also, State v. Malone*, 694 S.W.2d 723, 727–28 (Mo. banc 1985), *cert. denied*, 476 U.S. 1165, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986). There is sufficient evidence to support the two other aggravating circumstances found by the jury of appellant's previous capital murder conviction and that appellant was an inmate at the time of the murder.

cumstance that the murder was outrageously or wantonly vile, horrible or inhumane in that it involved torture or depravity of mind. We have already indicated that there was sufficient evidence to support this aggravating circumstance.

We review the sentence to determine if it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant. We repeatedly reviewed the propriety of the death sentence for murders committed in correctional institutions. *State v. Clemmons,* 753 S.W.2d 901 (Mo. banc 1988); *State v. Parkus,* 753 S.W.2d 881 (Mo. banc 1988); *State v. Antwine,* 743 S.W.2d 51 (Mo. banc 1987), *cert. denied,* ── U.S. ──, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); *State v. Amrine,* 741 S.W.2d 665 (Mo. banc 1987), *cert. denied,* ── U.S. ──, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *State v. Guinan,* 732 S.W.2d 174 (Mo. banc), *cert. denied,* ── U.S. ──, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987); *State v. Schlup,* 724 S.W.2d 236 (Mo. banc), *cert. denied,* ── U.S. ──, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987); *State v. O'Neal,* 718 S.W.2d 498 (Mo. banc), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987); *State v. Driscoll,* 711 S.W.2d 512 (Mo. banc), *cert. denied,* 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986); *State v. Roberts,* 709 S.W.2d 857 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986); *State v. Zeitvogel,* 707 S.W.2d 365 (Mo. banc), *cert. denied,* 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); *State v. Guinan,* 665 S.W.2d 325 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Bolder,* 635 S.W.2d 673 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *State v. Shaw,* 636 S.W.2d 667 (Mo. banc); *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982).

> Those imprisoned for violating our laws have cast upon the state both the expense of, and the responsibility for, their safe care while in confinement. We have always held the state to the highest standards in the exercise of that responsibility. Those for whom the state must bear responsibility should be held to an equally high standard of conduct. We are unaware of either sound reason or social policy for excusing the senseless killing of either fellow prisoners or corrections officers.

*Shaw,* 636 S.W.2d at 677.

The judgment and sentence of death are affirmed.

BILLINGS, C.J., and DONNELLY, ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

BLACKMAR, Judge, concurring.

I concur, except as to the discussion in Part IX about the "torture or depravity" aggravating circumstance, § 565.032.2(7). Under our repeated holdings, any error regarding this circumstance would not be ground for reversal, because the record adequately supports the other (prior conviction of murder and lawful custody) aggravating circumstances submitted. *State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981).

I had thought that *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), had been virtually ignored by the Supreme Court, especially after it denied review of our decision in *State v. Preston,* 673 S.W.2d 1 (Mo. banc 1984), but *Maynard v. Cartwright,* ── U.S. ──, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), shows that this is not so. Under that case, I doubt very much that a finding based on "depravity of mind," without "torture," would suffice to authorize a death sentence. I also doubt whether the circumstances detailed in *Preston,* 673 S.W.2d at 11, would suffice, unless torture is shown. When "torture" and "depravity of mind" are submitted disjunctively, by our longstanding instructional learning, both alternatives must be legally supported. *State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981) (Seiler, J., dissenting). Prosecutors and trial judges would be wise to avoid instructing on 565.032.2(7), unless a finding of torture is explicitly required.

I concur in all other portions of the opinion and in the judgment.