## 42154. FORD v. THE STATE.
### (335 SE2d 567)

SMITH, Justice.

This is a death penalty case. Appellant, James A. Ford, was convicted in Coweta County of armed robbery, rape, kidnapping with bodily injury, burglary, and murder. The case is here on direct appeal, for review under the Unified Appeal Procedure (252 Ga. A-13 et seq.), and for the sentence review required by OCGA § 17-10-35.[1] We affirm.

---

[1] The jury returned its verdict as to sentence on October 25, 1984. A motion for new trial was filed November 26, 1984, amended on January 7, 1985, heard January 18, 1985, and denied February 19, 1985. A notice of appeal was filed March 14, 1985, and the record was docketed in this court on March 29, 1985. The case was orally argued June 4, 1985.

*Facts*

The victim, Sarah Dean, managed the J & L gas station in Newnan. She usually began work at 6:00 a.m. Shortly after 5:00 a.m. on March 1, 1984, a burglar alarm went off at the station. Police responding to the call found the front door unlocked but nothing else out of the ordinary; however, attempts to contact Mrs. Dean were unsuccessful. Pending the arrival of the district supervisor from Marietta, the door was re-locked and the police left.

Soon afterwards, an employee of a neighboring business observed a small black male exiting J & L by a window, and contacted the police. Acting on information obtained from his mother, police questioned Steve Cox, who was found to be in possession of keys to the J & L station. Cox implicated Ford, and, shortly before 2:00 p.m., a warrant was obtained for the latter's arrest.

At approximately 3:00 p.m., Sarah Dean's automobile was located, submerged to its roof in a pond. After pulling the car out with a wrecker, police used the keys (which were in the ignition) to open the trunk, where they discovered the body of Sarah Dean.

Three hours later, Ford was arrested, after a high-speed automobile chase. He was found to be in possession of over $2,000.

Ford subsequently gave a written confession, which can be summarized as follows: He and Steve Cox, having decided to get some money to pay a fine, arrived at J & L just as the victim was preparing to leave, and forced their way into her car. Ford drove to a secluded area, where they undressed the victim and "had sex" with her. Afterwards, they put her in the trunk and drove around — buying marijuana with money they found in the victim's purse; driving to Atlanta, where Ford visited a girl friend; and returning to Newnan, where they spent an hour in a tavern. Next, they drove to a more secluded area. Ford opened the trunk and hit the victim on the head with a road sign. Finally, they pushed the car into a pond (with the victim still in the trunk). After disposing of the victim, the two returned to J & L on foot and used the victim's keys to enter the station. Ford got "a large amount of money out of the cabinet," and left by the front door when the police arrived.

Cox testified at trial. His testimony was generally consistent with Ford's confession, except he claimed that only Ford raped the victim. In addition, he testified that when they first entered the victim's car, Ford held a butcher knife to the victim's neck; that Ford threatened to kill the victim during the rape and again while they were at the tavern; that Ford responded to the victim's plea for mercy by telling her to "shut up"; and that as the car rolled into the pond, Cox could hear the victim beating on the trunk-lid.

Ricky Wright testified that on the morning of March 1 he and

Ford went shopping in Atlanta. En route, Ford admitted to Wright that he had burglarized J & L, raped the woman who managed it, put her in the trunk of her car and pushed the car into a pond. According to Wright, Ford was laughing and smiling as he described the crime. Wright testified that Ford had a large sum of money and gave Wright $150.

An autopsy established that the victim had drowned. Serological examination of vaginal swabbings positively established that sexual intercourse had recently occurred. Hairs found on the victim were consistent with having come from Ford (and inconsistent with having come from Cox).

The evidence overwhelmingly establishes Ford's guilt, and, therefore, more than suffices to meet the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### *Enumerations of Error*

1. In his 2nd enumeration, Ford contends that the prosecutor's use of peremptory strikes to remove 9 of 10 possible black jurors denied Ford his right to a jury comprised of a fair cross-section of the community. (One black served on the jury.) Ford has shown only that a large percentage — but not all — of black prospective jurors were peremptorily struck by the prosecution in *this* case. "He has failed to establish a systematic exclusion of black jurors, leading to a general condition that black citizens do not serve on criminal trial juries in the circuit." *Moore v. State*, 254 Ga. 525, 529 (2 (b)) (330 SE2d 717) (1985). Accordingly, we find no error here.

2. Prior to trial, the state reached an agreement with Steve Cox whereby, in exchange for his truthful testimony, he would be prosecuted only for armed robbery and burglary and the state would recommend "life plus 20," or, in other words, the maximum sentences for these crimes. The state, of course, was constitutionally required to and did reveal this information to Ford. *Owens v. State*, 251 Ga. 313 (1) (305 SE2d 102) (1983).

When Cox testified, the state lost no time in addressing this subject. When the state asked Cox what sentence he was going to get, Cox answered, "Six years." As the state prepared to refresh his recollection, the court interrupted to state: "Let me tell you right here and now you're not going to get any six years, do you understand that?" The state then proceeded to establish Cox's understanding that the recommended sentence was going to be life plus 20 years, and not 6 years.

In his 3rd enumeration of error, Ford contends that the court's comment was an improper expression of opinion. See OCGA § 17-8-

57.[2] We need not determine whether this code section actually was violated, inasmuch as Ford neither objected nor moved for a mistrial. *State v. Griffin*, 240 Ga. 470 (241 SE2d 230) (1978). We note, however, that Ford does not, even now, contest the truth of the court's comment, see *Abbott v. State*, 91 Ga. App. 380 (3) (85 SE2d 615) (1955), or contend otherwise than that regardless of the court's comment, the state had a constitutional duty to correct Cox's misconception, see *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), and if, as a result, Cox's credibility was adversely affected, Ford plainly was benefited thereby.

3. The trial court did not abuse its discretion by denying Ford's motion for sequestered voir dire. *Finney v. State*, 253 Ga. 346 (2) (320 SE2d 147) (1984). Enumeration 5 is without merit.

4. Regarding Ford's 6th enumeration, we find that the trial court did not err by refusing to grant Ford extra peremptory strikes, in addition to the 20 authorized by OCGA § 15-12-165.

5. Enumeration 7 complains of the trial court's refusal to change venue. Although almost all of the prospective jurors had heard at least something about the case, in view of the limited amount of prejudicial pre-trial publicity shown in this case, and the low percentage of veniremen excused for bias, prejudice or fixed opinion (5 of 60 or 8%),[3] the trial court did not err. *Devier v. State*, 253 Ga. 604 (4) (323 SE2d 150) (1984); *Waters v. State*, 248 Ga. 355 (1) (283 SE2d 238) (1981).

6. After his arrest, Ford gave two statements. The trial court excluded the second statement but ruled that the first statement was voluntary and admissible.[4] In his 8th enumeration, Ford complains of the court's refusal to exclude the first statement.

Ford was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and signed a form waiving those rights after officers read the form and explained each portion of the form as they went along. In view of the lack of any evidence of threats or promises by the officers, or of a request for an attorney by Ford, the court did not err by finding the confession to have been voluntary.

7. We adhere to our position that the practice of death-qualifica-

---

[2] OCGA § 17-8-57 provides: "It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express his opinion as to what has or has not been proved or as to the guilt of the accused . . ."

[3] In addition, 5 jurors who underwent voir dire were excused for prejudice or bias for or against the death penalty, and one was excused because she had served on the grand jury.

[4] The court's original pre-trial ruling on this issue was insufficiently specific. See Pretrial Transcript, October 12 hearing, p. 211; *Cofield v. State*, 247 Ga. 98 (4) (274 SE2d 530) (1981). However, the court subsequently clarified its ruling. See Trial Transcript p. 350; *Parks v. State*, 254 Ga. 403 (1) (330 SE2d 686) (1985).

tion of jurors is not unconstitutional, *Mincey v. State*, 251 Ga. 255 (2) (304 SE2d 882) (1983), despite the Eighth Circuit Court of Appeals' holding to the contrary. See *Grigsby v. Mabry*, 758 F2d 226 (8th Cir. 1985). We agree with the Missouri Supreme Court that *Grigsby* is contrary not only to the overwhelming weight of state and federal authority but also to *Wainwright v. Witt*, 469 U. S. ___ (105 SC 844, 83 LE2d 841) (1985). *State v. Nave*, 694 SW2d 729 (Mo. 1985). Therefore, we find enumeration 9 to be without merit.

8. After trial, Ford's family retained a private attorney to represent him in the post-conviction proceedings, including the motion for new trial and the appeal. The court-appointed trial attorney was dismissed. Ford contends in his 4th enumeration of error that his trial attorney rendered ineffective assistance of counsel, particularly at the sentencing phase of the trial.

"The bench mark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, ___ U. S. ___ (104 SC 2052, 80 LE2d 674) (1984). In order to prevail on an ineffectiveness claim, a convicted defendant must show (1) "that counsel's performance was deficient," i.e., that counsel's performance was not reasonable under all the circumstances, and (2) that this "deficient performance prejudiced the defense," i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id at ___. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ibid.

The complaining defendant must make both showings. His failure "to establish either the performance or the prejudice component results in denial of his Sixth Amendment claim." *King v. Strickland*, 748 F2d 1462, 1463 (11th Cir. 1984). A reviewing court need not "address both components if the defendant makes an insufficient showing on one," *Strickland v. Washington*, supra at ___, nor must the components be addressed in any particular order. Ibid.

With the foregoing in mind, we shall now undertake to address the various acts and omissions allegedly demonstrating ineffective representation. For reasons discussed below, we consider this enumeration of error together with enumeration 1, in which Ford complains of the prosecutor's argument at the sentencing phase of the trial.

(a) Ford claims that his trial attorney, Arthur Edge IV, should have offered the "vast wealth of data now available" on the subject of the constitutionality of Georgia's death penalty law, and claims that "[c]ompetent counsel would have known that this very issue is currently awaiting *en banc* decision by the United States Court of Appeals for the Eleventh Circuit in *McCleskey v. Zant . . .*"

In view of the decision since rendered by the *en banc* Eleventh Circuit on this issue, Ford clearly was not prejudiced by any omission here. See *McCleskey v. Kemp*, 753 F2d 877 (11th Cir. 1985) (affirming the denial of habeas relief on the ground of racial bias in the administration of the death penalty, and reversing the grant of habeas relief on another ground).

(b) Nor do we find any possible prejudice from counsel's failure to support with evidence his challenge to the practice of death-qualifying the jury. See Division 7, supra.

(c) Ford claims that attorney Edge made an insufficient effort to change venue. He asserts: "Competent counsel would have engaged an expert, or experts, to analyze the pretrial publicity; and to conduct a survey of the community and/or the prospective jurors to determine community sentiment. Counsel could have called numerous witnesses — being a resident of the area — to attest to the way knowledge and gossip circulate in a community of less than 40,000 people."

That counsel could have taken action that he did not does not necessarily render his performance deficient. Ford does not show how an expert analysis of pre-trial publicity could have accomplished any more than the introduction in evidence of whatever publicity existed. Nor has he explained why competent counsel could not reasonably assume that the voir dire of prospective jurors would establish community sentiment at least as well as a "survey of the community and/or the prospective jurors." (In particular, it would seem that the voir dire *is* a survey of the prospective jurors.)

We find no deficiency here, and, in addition, Ford has not established any reasonable probability that, had the suggested additional action been taken, a change of venue would have been granted.

(d) At the guilt-innocence phase of the trial, the court charged (inter alia):

"Malice *may be implied* where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." (Emphasis supplied.)

"[Intent] may be inferred from the proven circumstances or by acts and conduct or it *may be presumed* when it is the natural and necessary consequence of the act." (Emphasis supplied.)

Attorney Edge neither objected to these instructions, nor reserved any objections to them. See *Rivers v. State*, 250 Ga. 303, 309 (298 SE2d 1) (1982). Ford now claims that competent counsel would have detected the "clear *Sandstrom* problems" with these instructions, and would have objected. See *Sandstrom v. Montana*, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979).

We find nothing objectionable in the implied malice instruction. Compare OCGA § 16-5-1 (b); *Lamb v. Jernigan*, 683 F2d 1332, 1340 (11th Cir. 1982).

As to the intent instruction, we have previously stated our preference for charges stated in terms of "inferences" rather than presumptions (except as to the defendant's sanity and, of course, his innocence). See, e.g., *Rose v. State*, 249 Ga. 628, 631 (292 SE2d 678) (1982). "[T]he term 'inference' has tended to be used more frequently [than the term 'presumption'] for evidentiary devices that are permissive in nature . . ." *Lamb v. Jernigan*, supra at 1335-36 (fn. 4). Nevertheless, a "presumption" is not necessarily mandatory, and a permissive presumption is not unconstitutional so long as it is rational. *Ulster County Court v. Allen*, 442 U. S. 140, 157 (99 SC 2213, 60 LE2d 777) (1979).

The intent instruction here "was not reasonably susceptible of an interpretation that relieved the prosecution of its burden of proving intent beyond a reasonable doubt or otherwise undermined the factfinding responsibility of the jury." *Lamb v. Jernigan*, supra at 1340 (addressing an intent instruction identical to the one given in this case).

From the foregoing, it can readily be seen that attorney Edge was not remiss in failing to object to the above charges and that the defense was not prejudiced by the failure to object.

(e) There likewise being no error in the court's charge on conspiracy, *Anderson v. State*, 153 Ga. App. 401 (3) (265 SE2d 299) (1980), Edge's failure to object to the charge does not show ineffectiveness of counsel.

(f) We fail to see how Edge can be condemned for failing to request a charge on prior inconsistent statements as substantive evidence. Absent instructions to the contrary, the jury surely regarded substantively *all* the evidence presented to it. See *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982).

(g) Ford claims that attorney Edge should have obtained an independent psychiatric evaluation of the defendant, and should have filed a special plea challenging his competency.

Ford was evaluated prior to trial, by Dr. Donald P. Grigsby, Ph. D., chief of forensic services at the West Georgia Central Regional Hospital. Dr. Grigsby's report, included in the record, attached to the report of the trial judge (see OCGA § 17-10-35 (a)), reads, in part, as follows:

"James Ford has never been a prior patient at this hospital or at Central State Hospital; he did spend one year at the Milledgeville Youth Detention Center between the age of 15 and 16. James Ford has no record of prior psychiatric treatment in the State of Georgia.

"James Ford's current mental results are as follows: He is an 18 year old black male that looks his stated age . . . Numerous scars are located on his right forearm; otherwise, no remarkable body/facial characteristics/asymmetries were noted. His eye contact was fair. No

tremors or shakes or other psychomotor problems were noted. Vision and hearing appeared normal. His speech was forceful and short and to the point; he was relevant and coherent. Posture and gait were normal. His behavior during testing was attentive, he was cooperative but guarded and acted like a tough man. No impairment of memory function was seen. He was in touch with reality and his thoughts progressed from stimulus to logical conclusion. No abnormal psychiatric content of thought was noted. His affect was appropriate and flat; his mood was somewhat defiant and macho. He was oriented to time, person and place. His intellect appeared dull and his judgment slightly impaired as measured with the Mental Status Exam.

"Neurological screening was negative at this time. Emotional indicators on the Bender would suggest some anxiety.

"Intellectual assessment with the WAIS-R produced a Full Scale IQ of 73, placing him within the borderline range of intelligence. This is believed to be a valid assessment of his current level of functioning.

"Objective personality assessment was attempted but not successfully completed with the short form MMPI. The test was administered to James Ford; however, the results were invalidated by his 'faking sick.' This examiner did not detect the presence of any psychiatric disorder.

"It is the professional opinion of this examiner that James Ford is both legally competent to stand trial and criminally responsible for his behaviors. He is aware of the charges against him, he understands the nature of the judicial process, and he is able to consult with his attorney in building his defense. In regards to his criminal responsibility, it is the professional opinion of this examiner that he did and does know right from wrong and at the time of the alleged crime there was no evidence, whatsoever, for a delusional compulsion."

We do not have, on this record, any testimony from Edge as to why he did not move for an independent evaluation, or file a special plea of incompetence. Thus, we can only speculate as to the extent to which Edge might have relied upon, for example, his own observations of the defendant, or other matters, in addition to the above report. In any event, a special plea of incompetence requires "a determination of whether the defendant at the time of the trial is capable of understanding the nature and object of the proceedings against him and is capable of assisting his attorney with his defense." *Brown v. State*, 250 Ga. 66, 70 (295 SE2d 727) (1982). There being no indication in the record that Ford did not understand the nature and object of the proceedings or was incapable of assisting his attorney, Ford has failed to meet his burden of establishing deficiency or prejudice in the failure of trial counsel to file a special plea or to move for additional expert assistance on this issue. Compare *Lindsey v. State*, 254 Ga. 444 (330 SE2d 563) (1985).

(h) In a related vein, Ford contends that "crucial" mitigating evidence was "either not presented or was presented in a superficial manner which could not have informed the sentencing jury of its importance or weight."

Dr. James Thomas, a pediatrician, testified on behalf of the defense at the hearing on the motion for new trial. On November 8, 1973, when Ford was eight years old, Dr. Thomas diagnosed him as being hyperactive. He prescribed Ritalin, described in the Physician's Desk Reference (PDR) (1985 Edition) as a "mild central nervous system stimulant." Id. at 865. Ford took Ritalin (during the school year) for several years; Dr. Thomas last prescribed the drug on January 17, 1977 (but it was possibly refilled for a limited time afterwards).

Ford's mother testified at the sentencing phase of the trial that "he was a hyperactive kid." However, no evidence was presented at trial that Ford had taken Ritalin for this condition.

Ford calls our attention to the following warning in the PDR (p. 865):

"Drug Dependence.

"Ritalin should be given cautiously to emotionally unstable patients, such as those with a history of drug dependence or alcoholism, because such patients may increase dosage on their own initiative.

"Chronically abusive use can lead to marked tolerance and psychic dependence with varying degrees of abnormal behavior. Frank psychotic episodes can occur, especially with parenteral abuse.[5] Careful supervision is required during drug withdrawal, since severe depression as well as the effects of chronic overactivity can be unmasked. Long-term follow-up may be required because of the patient's basic personality disturbances."

Ford argues: "Clearly, evidence that Appellant, due to his prolonged use of Ritalin, was subject to psychotic episodes was evidence which would have carried a great deal of weight with his sentence. The state's case on punishment would have been effectively rebutted by a showing of another explanation for Appellant's behavior besides that he was evil and malicious."

This argument is based upon a misreading of the PDR. The quoted warning does not address itself to normal usage of Ritalin, even if "prolonged." It addresses, instead, "[c]hronically abusive use."

Not only has Ford not shown that he actually suffered psychotic episodes, he has presented no evidence of chronically abusive use

---

[5] Ford misquotes this term as "parental" abuse, instead of "parenteral" abuse. The adjective parenteral means: "1. outside the intestine 2. brought into the body through some way other than the digestive tract, as by subcutaneous or intravenous injection." Webster's New World Dictionary of the American Language, 2nd College Edition 1970. Ritalin, offered only in tablet form, is properly taken orally.

which would have the potential to cause such episodes. Thus, Ford has failed to establish that he was subject to psychotic episodes due to his use of Ritalin, and, therefore, has failed to establish that Edge's performance in this respect was deficient.

(i) Finally, Ford complains of Edge's failure to object to allegedly improper argument by the state, at both phases of the trial. In addition, he contends in his first enumeration of error that the prosecutor's improper closing argument at the sentencing phase of the trial rendered the imposition of sentence fundamentally unfair, citing *Hance v. Zant*, 696 F2d 940 (11th Cir. 1983).

We begin our analysis of these complaints by observing that the portion of *Hance v. Zant* addressing prosecutorial argument has been overruled. See *Brooks v. Kemp*, 762 F2d 1383, 1399 and 1404-1405 (11th Cir. 1985); *Tucker v. Kemp*, 762 F2d 1480, 1486 (11th Cir. 1985). Compare *Conner v. State*, 251 Ga. 113 (5) (303 SE2d 266) (1983) (expressing our disagreement with *Hance*). We find the correct approach to be as follows.

First, permissible arguments, no matter how effective, do not contravene fundamental fairness; likewise, a failure to object to permissible arguments cannot establish deficient attorney performance.

Second, where the prosecutor argues improperly and no objection is interposed, whether reversal is required depends upon an evaluation of prejudice that is undertaken in an essentially identical manner whether the improper arguments are considered directly or in the context of an ineffectiveness claim. Compare *Strickland v. Washington*, supra (prejudice is established by a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"), with *Brooks v. Kemp*, supra (applying *Strickland* "reasonable probability" test in context of improper prosecutorial argument), and *Conner v. State*, supra (where argument not objected to, we determine only whether impropriety was so egregious that death sentence was imposed as a result of passion, prejudice or other arbitrary factor).

Thus, our evaluation of Ford's direct attack upon the prosecutor's sentence-phase argument, as well as his indirect attack upon the prosecutor's argument in general, via his ineffectiveness claim, may be undertaken by determining, first, which (if any) portions of the state's argument were improper, and, second (if improprieties are discovered), whether the improper arguments were so egregious as to require a new trial.

(i-1) The guilt-innocence phase.

Ford complains that during the prosecutor's opening statement the evidence was described as "horrible and gruesome." Since this was an accurate description, we find nothing objectionable about it, despite Ford's contention that it was argumentative and inflam-

matory.

Nor do we find anything objectionable in the prosecutor's comment that he wished he could show a "video tape of what happened," but since he could not, he would "try to explain it" in such a way that "if you will try to imagine in your minds as if you're watching television . . . you'll see how the case is going to be presented to you and why it's presented in a certain way."

In the prosecutor's closing argument, however, we do find improprieties, including expressions of personal opinion and a misstatement of the law.

Regarding the expressions of personal opinion, we note that Directory Rule 7-106 (c) of our State Bar Canons of Ethics states in part: "In appearing in his professional capacity before a tribunal, a lawyer shall not: (3) assert his personal knowledge of the facts in issue, except when testifying as a witness; (4) assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein." 252 Ga. at 629.

"Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." Commentary to ABA Standards for Criminal Justice 3-5.8 (b) (2d ed. 1980), p. 3-89.

The prejudice emanating from such argument depends upon the context in which it is given. Although expressions of personal opinion are objectionable in any event, and should be avoided, nonetheless, when the evidentiary facts supporting such a conclusion are cited and the conclusion follows naturally from such facts, the mere use of the phrase "I think . . ." as opposed to "I contend . . .," or "I submit . . .," or "The evidence shows . . .," is unlikely to have a strong impact on the jury's independent evaluation of the evidence. Cf. *Conklin v. State*, 254 Ga. 558, 571 (331 SE2d 532) (1985); *Brooks v. Kemp*, supra, 762 F2d at 1413-1414.

Here, the prosecutor stated that he did not "think" there was "any question" but that the butcher knife Ford wielded was a deadly weapon, that he "really" did not "think" the money Ford got was worth Sarah Dean's life, and that although the jury would have a hard job deciding the case, he "imagine[d]" Sarah Dean would "swap places with [the jury] real quick." In addition, he argued: "Here we have, according to all the testimony, and I didn't know Mrs. Dean, but I think if I did I'm sure she was a fine person. I did not know her but you heard the testimony from the people that did." Finally, he

stated his dislike of Steven Cox.

Each of these arguments was objectionable (and also "easily avoided").[6] However, we find no reasonable probability that their exclusion would have changed the result at the guilt-innocence phase of the trial, even when considered in conjunction with the misstatement of the law dealt with below.

The misstatement occurred when the prosecutor argued as follows: "[T]he judge will charge you, that in malice, malice aforethought, number one, that a person intends the act that he committed. If they do something — if I come and grab the podium and I push it over, I intended to do that, unless it's proven otherwise. If you see me do that you're pretty sure that's what I intended, even though you can't read my mind. So a person commits an act and by that act a person is killed; the completion of that act causes death, that's a sufficient intent . . . [T]hat is the intent that the law speaks of as to what did a person think. Did I do that action that I just discussed with you. Don't let that be confusing to you all."

This explanation was incorrect. *Francis v. Franklin*, 471 U. S. __ (105 SC 1965, 85 LE2d 344) (1985); *Sandstrom v. Montana*, supra. However, the trial court's instructions on intent and malice were correct, and, considered in light of the strength of the evidence, were sufficient to cure the improper impact of the argument.

(i-2) The sentencing phase.

We do not agree with Ford's contention that the prosecutor "unfairly summarized the controversy over the . . . death penalty by focusing exclusively on retribution." Although there are other legitimate sentencing concerns, see *Conner v. State*, supra, a prosecutor is under no obligation to argue all of them.

The prosecutor did not err by noting the obvious fact that the victim was gone and would never be here again. See *Brooks v. Kemp*, supra at 1409-10. Nor did the prosecutor err by arguing: "[O]ur government has determined that the death penalty is appropriate and necessary in certain cases and should be provided . . . It's up to you to decide if this is that type of case that deserves the death penalty." This was a correct statement of the law. His further argument that law and order depended upon the confidence of the citizenry that criminals would receive the punishment they deserved was not improper. See *Conner v. State*, supra at 120 (quoting former U. S. Supreme Court Justice Stewart's plurality and concurring opinions in *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976), and *Furman v. Georgia*, 408 U. S. 238 (92 SC 2726, 33 LE2d 346)

---

[6] "This kind of argument is easily avoided by insisting that lawyers restrict themselves to statements such as 'the evidence shows . . .' or something similar." ABA Standards for Criminal Justice, supra at 3-89.

(1972), respectively).

Finally, the prosecutor committed no impropriety by arguing that the jury was commanded "to do what is right and what is just"; by following his discussion of the heinousness of the crime with the dramatic assertion that Sarah Dean would be "in there" with the jury, asking for justice; or by concluding: "By God we draw the line somewhere and this is it folks. Enough is enough and we draw the line. You say it for Sarah Dean, say it for all of us, enough is enough. It's got to stop. Thank you."

We do not, however, find that the prosecutor's argument was devoid of impropriety.

Our major concern is not the brief expression of a personal opinion early in his argument. The effect of this impropriety clearly was inconsequential.

The more serious impropriety occurred when the prosecutor argued as follows:

"If someone wants to forgive Ford, let Sarah Dean forgive him. She is the only one who has the right to do that. She and the Lord. Don't take that right away from her. Say, well that's all right Sarah, I'm going to forgive him for what he did to you. Don't take that away. That would be the worst tragedy we could have in this court for you to do that . . .

"God is the only one who can forgive. He and Sarah Dean. Christ said you can turn the other cheek when you are hit but you can't turn the cheek for someone else. The law of God prescribes the law of man and to impose order on society we must have both . . .

"Come back with whatever you like. It's your choice. But in fact, as I said before, not only would it be a travesty but a very sick joke against Sarah Dean . . ."

It is undoubtedly true that a jury has no right to forgive a defendant. See *Felker v. State*, 252 Ga. 351, 378 (314 SE2d 621) (1984). The fact of conviction, however, suffices to ensure that the jury will not forgive the defendant. At the sentencing phase of the trial the question is not *whether* the defendant will be punished, it is, rather, *how much* he will be punished. Once a statutory aggravating circumstance is established, the issue is not forgiveness, it is mercy. By confusing these two terms, the prosecutor in effect argued that the jury had no right to be merciful. Such an argument is legally incorrect.

"Just as retribution is an appropriate justification for imposing a capital sentence . . . [so is] mercy . . . an acceptable sentencing rationale." *Drake v. Kemp*, 762 F2d 1449, 1460 (11th Cir. 1985).

A prosecutor is entitled to "urge vigorously that a death sentence *is* appropriate punishment in the case at hand . . ." *Walker v. State*, 254 Ga. 149, 159 (327 SE2d 475) (1985). It follows that he is entitled also to "urge vigorously" that mercy is inappropriate "in the case at

hand." To argue, however, that the jury has no *right* to be merciful goes too far, as does the characterization of the exercise of mercy as a "travesty and a sick joke." *Drake v. Kemp*, supra. Cf. ABA Standards for Criminal Justice 3-5.10 ("The prosecutor should not make public comments critical of a verdict, whether rendered by judge or jury.")

Having identified improprieties in the prosecutor's sentencing argument, we must now determine "whether there was a reasonable probability that the improper arguments changed the jury's exercise of discretion in choosing between life imprisonment or death." *Tucker v. Kemp*, 762 F2d 1496, 1508 (11th Cir. 1985).

Examining all the circumstances, we do not find a reasonable probability that, but for the improper argument, Ford would have received a life sentence.

First, as we noted above, the prosecutor had a right to argue that mercy was inappropriate in the case at hand, and much of the prosecutor's argument was devoted to a discussion of facts which supported his contention that the death penalty was called for in this case.

Second, the prosecutor did concede, albeit grudgingly, that the jury had the right to recommend a life sentence, and the defense attorney, for his part, pointed out that he was not asking the jury for forgiveness, excuse, or pardon — he was asking only for something less than a death sentence, and he called the jury's attention to the likelihood that if the jury opted for mercy, Ford could get "four life sentences and twenty years on top of that."

Third, the trial court's instructions informed the jury that it was the latter's responsibility "to determine within the limits prescribed by law the penalty that shall be imposed," explaining that every person found guilty of murder would be "punished by death or by imprisonment for life." The court instructed the jury to consider mitigating circumstances, which the court defined as "those which do not constitute a justification or excuse for the offense of murder, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability so as to justify a sentence of life imprisonment rather than death," and further explained that the jury could provide for a life sentence whether or not it found any mitigating circumstances, "for any reason satisfactory to [the jury], or for no reason."

These countervailing arguments and instructions mitigated to a large degree, if not completely, the impropriety of the prosecutor's argument.

We note that in this case "[t]here was overwhelming evidence of guilt, thus reducing to a minimum the chance that an innocent person

will be executed." *Tucker v. Kemp*, 762 F2d, supra at 1509.[7]

Moreover, the jury found that the murder was "outrageously or wantonly vile, horrible or inhuman," and that it was committed during the commission of the additional capital felonies of armed robbery, kidnapping with bodily injury, and rape. See OCGA § 17-10-30 (b) (2) and (b) (7). The victim gave Ford no reason to attack her; the crimes were entirely unprovoked, and the murder was preceded by serious physical and psychological abuse. The crime was indeed (as the prosecutor contended) "horrible."

In mitigation, it was shown that Ford had grown up without a father present, had experienced difficulty with his schoolwork, but had never before been in serious trouble. While not frivolous, these mitigating circumstances are hardly "commanding" in the face of the egregiousness of the crime. *Brooks v. Kemp*, supra at 1416. Compare *High v. Zant*, 250 Ga. 693, 694-95 (300 SE2d 654) (1983).

"Considered in light of all facts and circumstances of the case, the improper arguments, most of which were mitigated by other arguments and instructions by the court, were not sufficient to undermine confidence in the outcome." *Brooks v. Kemp*, supra at 1416.

(j) For the foregoing reasons, we find that neither attorney Edge's performance nor the prosecutor's improper argument justifies reversal of Ford's convictions or death sentence.

*Sentence Review*

9. The jury found that the offense of murder was committed while the defendant was engaged in the commission of the additional capital felonies of rape, kidnapping with bodily injury, and armed robbery. See OCGA § 17-10-30 (b) (2). Ford was convicted of these capital felonies at the guilt-innocence phase of the trial. Just as the evidence supports Ford's conviction for these offenses, the evidence supports the jury's findings in regard to the § b (2) aggravating circumstance.

The jury also found that "the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture or depravity of mind." See OCGA § 17-10-30 (b) (7). In this case, the victim clearly suffered serious and intentionally-inflicted physical and psychological abuse. She was kidnapped, raped, stuffed into the trunk of her own car, driven around for several hours, hit on the head with a metal road sign (after pleading for her life), and pushed into a pond (still in the trunk of her car and still conscious), where she drowned. The evidence supports beyond a reasonable doubt the jury's findings

---

[7] We note in addition that Ford testified at the sentencing phase — admitting the crimes, but asking for mercy.

of the § b (7) aggravating circumstance. OCGA § 17-10-35 (c) (2). Compare *Whittington v. State*, 252 Ga. 168 (9 b) (313 SE2d 73) (1984); *Phillips v. State*, 250 Ga. 336 (6) (297 SE2d 217) (1982).

10. From our review of the record, including matters addressed in Division 8 of this opinion, we find that the sentence of death was not imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

11. Ford's death sentence is not disproportionate to the life sentence received by co-defendant Steve Cox. See *Allen v. State*, 253 Ga. 390 (8) (321 SE2d 710) (1984). Aside from the difference in ages (Cox was only 15 at the time of the crime), the evidence tends to show that Ford was the more culpable of the two, i.e., that he and not Cox drove the car, raped the victim, hit her with the road sign, let the car out of gear prior to pushing it into the pond, and got the money.

In addition, Ford's death sentence is neither excessive nor disproportionate to sentences imposed in similar cases generally. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case.

*Judgment affirmed. All the Justices concur.*

### Appendix.

*Alderman v. State*, 254 Ga. 206 (327 SE2d 168) (1985); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Stevens v. State*, 245 Ga. 583 (266 SE2d 194) (1980); *Burger v. State*, 245 Ga. 458 (265 SE2d 796) (1980); *Hardy v. State*, 245 Ga. 272 (264 SE2d 209) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Ruffin v. State*, 243 Ga. 95 (252 SE2d 472) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Westbrook v. State*, 242 Ga. 151 (249 SE2d 524) (1978); *Morgan v. State*, 241 Ga. 485 (246 SE2d 198) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978).

### Decided October 29, 1985.

*Harvey & Jarnagin, C. Nelson Jarnagin,* for appellant.
*Arthur E. Mallory III, District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn, Staff Assistant Attorney General,* for appellee.