## S99P0289. GULLEY v. THE STATE.
### (519 SE2d 655)

BENHAM, Chief Justice.

William Marvin Gulley was convicted of malice murder, aggravated battery (two counts), burglary, armed robbery (two counts), rape, aggravated assault (three counts), kidnapping with bodily injury (two counts), theft by taking, possession of a knife during the commission of a crime, and possession of a firearm during the commission of a crime. The jury recommended a death sentence for the murder after finding beyond a reasonable doubt the following eleven aggravating circumstances: the murder was committed while the defendant was engaged in the commission of two aggravated batteries, burglary, two armed robberies, rape, and two kidnappings with bodily injury, OCGA § 17-10-30 (b) (2); and the murder was outrageously and wantonly vile, horrible, and inhuman in that it involved

torture, depravity of mind, and an aggravated battery to the victim. OCGA § 17-10-30 (b) (7). The trial court sentenced Gulley to death and he appeals. We affirm.[1]

The evidence adduced at trial authorized the jury to find that while Gulley rode around Dougherty County with two acquaintances on December 13, 1994, they decided to steal a television, and drove to a house belonging to 81-year-old Mary Garner. Gulley had only recently returned to Dougherty County but had lived there when he was younger, knew Mary Garner's family, and recognized her house. Years earlier, Gulley's father had been romantically involved with Ms. Garner's daughter, Freddie Beasley.

Gulley entered the house through a bedroom window after removing the window screen. The two men who were with him then drove away, leaving him stranded. While Gulley waited for the men to return, he cooked and ate some sausages and ate some ice cream. Gulley was still in the house when Ms. Garner and her 60-year-old daughter, Curly Bell Swan, pulled up in the driveway in Ms. Swan's Buick Skylark. The women noticed the missing window screen and, believing that the burglar was gone, went inside the house to call the police. Gulley saw the women coming and pulled a blue hood over his face after poking eyeholes in the hood with a screwdriver. He armed himself with a wooden stick and a shotgun he found in the house.

Gulley attacked the women when they entered, beating them with the stick and the shotgun. The blows broke Ms. Swan's wrist and severely lacerated Ms. Garner's head. After forcing the women into the bedroom at gunpoint, Gulley spoke with them about their family members he recognized in photographs in the bedroom. He told them he was looking for Freddie and wanted to kill her because she had broken up his family by dating his father. Gulley made Ms.

---

[1] The crimes were committed on December 13, 1994. Gulley was indicted in 1995 and re-indicted on June 25, 1997, for malice murder, aggravated battery (2 counts), burglary, armed robbery (2 counts), rape, aggravated assault (3 counts), kidnapping with bodily injury (2 counts), false imprisonment (2 counts), theft by taking, possession of a knife during the commission of a crime, and possession of a firearm during the commission of a crime. The State re-filed its notice of intent to seek the death penalty on June 26, 1997. The State dropped the false imprisonment charges and a jury convicted Gulley of the remaining counts on February 18, 1998. The jury recommended a death sentence for the murder on February 20, 1998. In addition to the death sentence for murder, the trial court sentenced Gulley to twenty years for each aggravated battery; twenty years for burglary; twenty years for aggravated assault; twenty years for theft by taking; five years for possession of a knife during the commission of a crime; five years for possession of a firearm during the commission of a crime; and life imprisonment for each count of rape, armed robbery, and kidnapping with bodily injury, all sentences to be served consecutively. The trial court merged two aggravated assault convictions with the other convictions. Gulley filed a motion for new trial on February 25, 1998, which was amended on September 2, 1998, and denied by the trial court on September 21, 1998. The appeal was docketed in this Court on November 17, 1998, and orally argued on February 9, 1999.

Swan show him her identification to prove she was not Freddie. He used a knife to cut cloth strips from a towel, which he used to tie up Ms. Garner. He took her into the bathroom and stabbed her twice in the chest. The medical examiner testified that one of the stab wounds fatally damaged her heart; the resulting internal bleeding put pressure on her heart and eventually compressed it until it was unable to continue beating. The doctor estimated that it would have taken her about ten minutes to die after the fatal wound was inflicted. Gulley returned to the bedroom and raped Ms. Swan while holding the knife to her neck. During the rape, Ms. Swan could hear her mother praying in the bathroom. After the rape was completed, Gulley strangled Ms. Swan with a cord until she passed out. He took the women's purses and stole Ms. Swan's Buick Skylark from the driveway. Ms. Swan eventually regained consciousness and flagged down a mail carrier who called the police.

Based on the assailant's familiarity with Mary Garner's family, relatives of the victims named Gulley as a possible suspect. Fingerprints on the window screen and the Buick Skylark matched Gulley. DNA taken from semen stains on Ms. Swan's undergarments genetically matched Gulley's DNA. In an audiotaped statement, Gulley confessed to the crimes.

In the sentencing phase, the State presented evidence that Gulley murdered a 49-year-old woman and her 84-year-old mother in East Point, Georgia, on December 7, 1994, only a week before the murder of Ms. Garner. Gulley entered through a window after removing the window screen. He took one of the women's purses after beating them to death with a claw hammer.

1. The evidence summarized above was sufficient to authorize a rational trier of fact to find Gulley guilty beyond a reasonable doubt of malice murder, aggravated battery (two counts), burglary, armed robbery (two counts), rape, aggravated assault (three counts), kidnapping with bodily injury (two counts), theft by taking, possession of a knife during the commission of a crime and possession of a firearm during the commission of a crime. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find the statutory aggravating circumstances which supported his death sentence for the murder. Id.; OCGA § 17-10-35 (c) (2).

2. Gulley claims the trial court erred by ruling that his audiotaped statement was voluntary and admissible. We disagree.

" 'The standard for determining the admissibility of confessions is the preponderance of the evidence. To determine whether the state has proven that the confession was made voluntarily, the trial court must consider the totality of the

circumstances. Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal.'"

*Gober v. State*, 264 Ga. 226 (2) (b) (443 SE2d 616) (1994), quoting *Lee v. State*, 154 Ga. App. 562, 563 (269 SE2d 65) (1980). The police discovered one of Gulley's fingerprints on the window screen of the entry window and another of his fingerprints on the trunk of the Buick Skylark. In an interview with police on December 30, 1994, Gulley said he had not been at the Garner house since 1982. Although Ms. Swan told police that the assailant had wiped down the furniture and other surfaces, the police found several unidentified palm prints inside the house. They obtained a search warrant to secure Gulley's palm prints and, at 6:10 p.m. on January 10, 1995, brought Gulley in to obtain the palm prints. After the prints were taken, Gulley agreed to be interviewed. From then until 2:25 a.m., when Gulley gave the audiotaped statement, the police read Gulley his *Miranda* rights a total of six times, and he waived his rights each time. He executed three written waivers and an oral waiver was recorded at the start of the audiotaped statement. Gulley also consented to a polygraph examination, to give blood for DNA testing, and to give the police his clothes because they resembled the clothes worn by the assailant, according to Ms. Swan's description. Gulley was 41 years old and did not appear to be under the influence of alcohol or drugs; was not threatened or coerced, and never requested an attorney; and was given food and rest room breaks. Although a police officer stated that Gulley was not free to leave before he gave the audiotaped statement, Gulley was not told this, never asked to leave, and was not handcuffed. The police had interviewed Gulley about two weeks earlier and had allowed him to go home at the conclusion of that interview. After reviewing the totality of the circumstances, we conclude that the trial court did not err by ruling that the audiotaped statement was voluntary and admissible. See id. To the extent that Gulley also claims that his confession was inadmissible because it was the product of an illegal arrest, we further find that probable cause for a warrantless arrest existed when Gulley was brought in for palm prints: the victims' family had named Gulley as a suspect due to the assailant's comments about the Garner family during the crimes; Gulley fit Ms. Swan's description of the height and weight of the assailant; Gulley's clothing resembled the assailant's clothing; and Gulley's fingerprints were found at the crime scene with no reasonable explanation from Gulley as to how they came to be there. See *Brown v. State*, 262 Ga. 728, 729 (2) (a) (425 SE2d 856) (1993) (probable cause to support a warrantless arrest exists if the arresting officer has knowledge and reliable information sufficient for a pru-

dent person to believe the accused has committed an offense).

3. Based on the totality of circumstances listed in the previous enumeration, we conclude the trial court did not err by ruling that Gulley's consent to the search and seizure of his blood was freely and voluntarily given. See *Raulerson v. State*, 268 Ga. 623 (2) (a) (491 SE2d 791) (1997).

4. Gulley filed a motion requesting that the State give notice of its intent to present evidence of "other crimes or bad acts or similar transactions or occurrences in evidence against him" no later than 120 days before trial. The trial court granted the motion. The State served Gulley with notice of its intent to present sentencing phase aggravating evidence of the East Point double murder 27 days before trial. Gulley moved to exclude this evidence because the State did not comply with the 120-day order. The trial court denied the motion, and Gulley claims that this denial is reversible error. We disagree. Gulley expressly based his motion to require 120-day notice of "other crimes or bad acts or similar transactions or occurrences" on Uniform Superior Court Rule 31, which governs the introduction by the State of similar transactions or occurrences at trial, and requires that the State provide pretrial notice of its intent to do so. However, Uniform Superior Court Rule 31.3 (F) states that this notice of similar transactions or occurrences "shall not apply to sentencing hearings." The introduction of aggravating evidence in the sentencing phase is controlled by OCGA § 17-10-2, which requires the State to provide pretrial notice of its intent to introduce such evidence. OCGA § 17-10-2 (a) and (c); *Cobb v. State*, 244 Ga. 344 (20) (a) (260 SE2d 60) (1979) (service of the notice of aggravating evidence upon capital defendant one day before trial does not violate OCGA § 17-10-2 (a)). The State complied with that statutory requirement. See id. Moreover, as noted by the trial court, Gulley cannot claim surprise at the notice of this aggravating evidence because the defense was already aware that law enforcement knew of Gulley's connection to the East Point murders. We find no error.

5. The State did not withhold exculpatory evidence. See *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). Gulley claims that the State had exculpatory evidence in the East Point investigative file regarding the double murder introduced in the sentencing phase, such as other suspects, and did not provide this information to Gulley. In order for Gulley to prevail on a *Brady* claim, he must show:

> that the State possessed evidence favorable to the defendant; the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evi-

dence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different.

*Burgeson v. State*, 267 Ga. 102 (2) (475 SE2d 580) (1996). Gulley's *Brady* claim fails because he clearly could have obtained this information on his own. The record shows that the East Point file was open and available for Gulley's inspection before trial,[2] but the defense did not examine it. A defense investigator traveled to East Point and spent an hour talking to one of the detectives about the East Point case, but he never asked to look in the file. Also, pursuant to a defense subpoena, the lead detective working the East Point case brought the entire East Point investigative file to Dougherty County for a pretrial hearing, but the defense did not examine the file. There was no *Brady* violation. See id.; *Crowe v. State*, 265 Ga. 582 (7) (458 SE2d 799) (1995) (*Brady* does not require that the defendant be given copies of material, exculpatory evidence, but only that such evidence be made available to him). The trial court also did not abuse its discretion by denying Gulley's motion for a continuance based on his alleged need for more investigation into the East Point murders. OCGA § 17-8-22; *Martin v. State*, 268 Ga. 682 (2) (492 SE2d 225) (1997) (the granting or denial of a motion for continuance is a matter for the sound discretion of the trial court).

6. Gulley claims several errors in the denial of his motion for new trial.

(a) In the sentencing phase, during Gulley's cross-examination of the lead detective on the East Point double murder investigation, the witness testified that he had no suspects other than Gulley in the East Point murders. Gulley claims that response was a material misrepresentation because the East Point investigative file contained information about other suspects. However, upon review of the record, we conclude there was no misrepresentation because at the time of Gulley's trial the other suspects had been excluded by the investigation. Gulley was the only person who was served with arrest warrants for the East Point murders.

In addition, there was much evidence of Gulley's guilt, supplied to the East Point police by Gulley himself. In 1995, Gulley directed his lawyers to contact law enforcement and tell them he had information about a double murder in East Point. Gulley wanted to use this information to broker some kind of plea bargain that would include the Dougherty County prosecution. He supplied the East Point police with information to show that he was reliable and he eventually gave

---

[2] The trial court had also ordered that the Dougherty County file be open to the defense before trial.

them a statement.[3] Gulley provided a detailed, accurate description of the commission of the murders and the crime scene; a description that included many details that only the perpetrator could know. For example, he accurately described the layout of the East Point house, including the "sunken" living room and the position of the furniture at the time of the murders. He said both victims were attacked in the bedroom, one victim being initially attacked there and the other victim being attacked when she came to her aid, which was consistent with the crime scene evidence. He correctly said that the television in the bedroom where the women were murdered was left on. He said the victims had a small "yapping" dog, which was true, but the dog had been removed before any reporters arrived and was not reported by the news media. He correctly said the murder weapon was a claw hammer, which was especially significant because the news media erroneously reported that the murder weapon was a crowbar, and the East Point police had deliberately not corrected the media about the murder weapon because they wanted some information with which to corroborate confessions. Lastly, Gulley admitted he had been inside the house while the murders were taking place, but said he was watching television in the living room while the women were murdered in the bedroom by a drug hit man named "Tony" for a drug supplier named "Big Ike" or "Danny."[4] We conclude that the witness did not make a material misrepresentation during his testimony.[5]

(b) Gulley claims that the district attorney made a material misrepresentation when he told the trial court at a pretrial hearing on January 30, 1998, that he had received copies of the East Point arrest warrants "yesterday or the day before." Gulley points to the facsimile of the arrest warrants, which shows that they were faxed to the Dougherty County district attorney's office on January 22, 1998. We find that this representation was not material, nor is there sufficient evidence to show that it was false.

(c) Gulley was not denied a thorough and sifting cross-examination of Detective Gorman. OCGA § 24-9-64.

(d) Gulley claims that the trial court erred by allowing the State to introduce two photographs of the victim in life; at trial, Gulley objected and moved for a mistrial because he was not previously shown copies of these photos. On appeal, Gulley argues that the admission of these photos violated the trial court's order that the

---

[3] The police and prosecutors in both jurisdictions refused to enter into any kind of plea bargain or immunity deal.

[4] There was no evidence the East Point victims were involved with drugs. The police attempted to identify and locate the people named by Gulley but they were unsuccessful.

[5] We further note that Ms. Swan testified that during the commission of the Dougherty County crimes Gulley threatened the victims by saying, "I have killed once and I'll kill again."

State provide all of the evidence it intended to use to the defense at least 120 days before trial. However, as noted in Division 4, the trial court's 120-day order applied only to other crimes or similar transactions, not to photographs of the victims. In its ruling denying the motion for mistrial, the trial court stated that while the photographs "may not have been provided to the defense earlier, there was an open file as ordered by the Court." Further, "[t]he general rule is that it is not error to admit a photograph of the victim while in life." *Ledford v. State*, 264 Ga. 60 (14) (439 SE2d 917) (1994). We conclude that the trial court did not err by admitting the photographs and denying the motion for mistrial.

(e) Gulley claims that the State was improperly permitted to inject religion into the trial through testimony from Ms. Swan that she could hear her mother praying during the commission of the crimes. However, Gulley made no objection at trial regarding the injection of religion into the case and this argument is therefore waived on appeal. *Earnest v. State*, 262 Ga. 494 (1) (422 SE2d 188) (1992).

(f) Ms. Swan knew Gulley when he was younger and had worked with him at a local hospital. The prosecutor asked her, "if he had not had that mask on, the blue mask, would you have recognized him?" When Ms. Swan responded affirmatively, Gulley objected that the question called for speculation because Ms. Swan had testified that she could not identify her masked attacker. The question was not subject to that objection because it did not call for speculation. In context, the question merely asked whether, without a mask on his face, Ms. Swan could recognize Gulley, with whom she testified she was acquainted. The trial court did not err in rejecting this ground of Gulley's motion for new trial.

(g) The remaining grounds listed under this enumeration are addressed in other divisions of the opinion.

7. Gulley challenges the trial court's failure to remove eight prospective jurors for hardship reasons. However, the record shows that two of these prospective jurors were removed by the trial court due to hardship. With regard to the remaining six prospective jurors, we find that the trial court did not abuse its discretion in refusing to remove them for hardship reasons. OCGA § 15-12-1 (a); *McMichen v. State*, 265 Ga. 598 (33) (a) (458 SE2d 833) (1995); *Dorillas v. State*, 224 Ga. App. 336 (1) (b) (480 SE2d 351) (1997) (whether to excuse a juror for hardship lies within the trial court's discretion).

Gulley also claims error in the trial court's ruling on challenges for cause to four prospective jurors. The record shows that prospective juror Terry was not subjected to a challenge for cause and the trial court did not err by failing to excuse her sua sponte. *Spencer v. State*, 260 Ga. 640 (1) (b) (398 SE2d 179) (1990). When the trial court

was hearing hardship excuses, prospective juror Dawson requested to be excused for hardship because she knew both of the victims. The trial court stated that this was not a valid hardship reason, and should be addressed in individual voir dire. In individual voir dire, juror Dawson stated that she could never vote to impose the death penalty, and Gulley agreed with the State that she was not qualified to serve. The trial court did not err by excusing her for cause. See *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985); *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997). Although prospective juror Fowler vacillated about whether he could vote to impose the death penalty, he did state that he could never vote to impose a death sentence and that he could not give fair consideration to the death penalty option. The trial court was authorized to strike this juror for cause after finding that his views about the death penalty would substantially impair the performance of his duties as a juror in accordance with his instructions and oath. See *Greene*, supra at 49 (an appellate court must give deference to the trial court's resolution of any equivocations in a prospective juror's responses during death penalty voir dire). Finally, prospective juror Marshall stated that she had heard about the case in the news but could lay aside any opinions she had formed and decide the case based only on the evidence presented in court. The trial court did not err by refusing to remove this juror for cause. See *Mize v. State*, 269 Ga. 646 (6) (e) (501 SE2d 219) (1998). The trial court's conduct of the voir dire in this case was not improper. See *Spencer*, 260 Ga. at 641 (scope of voir dire is left to the sound discretion of the trial court). We find no error.

8. Gulley claims that improper bad character evidence was admitted in the sentencing phase. During the State's cross-examination of the court-appointed psychiatrist, the psychiatrist stated that Gulley told him as part of his medical history that he did not use drugs but he had sold cocaine for several years. Gulley moved for a mistrial, which was denied. Instead, the trial court issued detailed curative instructions, telling the jury to disregard the testimony about Gulley selling drugs. We conclude that the curative instructions cured any possible error that may have resulted from the psychiatrist's disclosure of Gulley's past drug dealing. In addition, we note that bad character evidence is admissible in the sentencing phase. See *Fair v. State*, 245 Ga. 868 (4) (268 SE2d 316) (1980) (reliable evidence of defendant's bad character and past criminal record is generally admissible in the sentencing phase).

9. The trial court did not err by refusing to give Gulley's requested charge on voluntary manslaughter. The trial court charged the jury on voluntary manslaughter and its charge was taken directly from the suggested pattern jury instructions and was a cor-

rect statement of the law. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2nd ed. 1991), p. 73; OCGA § 16-5-2 (a). The guilt-innocence phase jury charge was not improper.

10. After review of the record, we conclude that Gulley's claim of prosecutorial misconduct is without merit. See *Roberts v. State*, 267 Ga. 669 (3) (482 SE2d 245) (1997).

11. Gulley claims that the trial court was not impartial but he waived this issue on appeal by failing to object to any alleged judicial partiality at trial. *Earnest*, 262 Ga. at 495 (1). Also, the record does not support a claim of judicial bias against Gulley. Informing prospective jurors that death penalty trials are conducted in two phases, with the second phase conditional on a finding of guilt, is not improper.

12. During the State's cross-examination of the defense psychologist in the sentencing phase, the prosecutor asked the expert a series of questions about his failure to prepare a written report in this case, and whether this omission was an attempt to limit the State's ability to prepare for cross-examination. The prosecutor also asked the expert whether the omission was due to the State's cross-examination in a previous case where the expert was questioned about inconsistencies in a written report he had prepared.[6] Gulley claims that this questioning constituted non-statutory aggravating evidence for which he was not given pretrial notice, and that it was otherwise improper. We disagree. The cross-examination was not aggravating evidence because it did not constitute evidence of the defendant's crime, character or background. See *Fair*, 245 Ga. at 873. Instead, the State's questions were permissible as an attempt to show the expert's possible bias against the State or his lack of credibility regarding his opinion of Gulley's mental health. OCGA § 24-9-64.

13. In the sentencing phase, Gulley sought to introduce an article from the Atlanta Journal-Constitution that described a "Bill Gulley" saving the lives of two people over a three-day span in the Atlanta area in 1992. The defense did not present the reporter who wrote the article or any eyewitnesses to the alleged acts described in the article (Gulley did not testify at trial). Instead, the defense wanted to introduce the article through the testimony of an acquaintance of Gulley who would have testified that Gulley showed him the article and claimed he was the Bill Gulley mentioned therein. The trial court excluded the article as inadmissible hearsay. Gulley claims that this ruling was error because the hearsay rule is relaxed in the sentencing phase of a capital trial. See *Green v. Georgia*, 442

---

[6] The prosecutor did not describe the previous case specifically; he only reminded the witness about "the last time you testified here in court" and "the last time you rendered a written report and sent it to me."

U. S. 95 (99 SC 2150, 60 LE2d 738) (1979) (hearsay rule must not be applied mechanistically in the sentencing phase of a capital trial to "defeat the ends of justice"); *Collier v. State*, 244 Ga. 553 (11) (261 SE2d 364) (1979), overruled on other grounds by *Thompson v. State*, 263 Ga. 23 (2) (426 SE2d 895) (1993).

However, the hearsay rule is not suspended in the sentencing phase. *Smith v. State*, 270 Ga. 240 (12) (510 SE2d 1) (1998). The "unique circumstances" present in *Green* to support the reliability of the hearsay statement in that case (accomplice's confession to a close friend that he had been the shooter was a statement against interest, was corroborated by other evidence, and was used at the accomplice's trial to convict him) are not present in this case. See id. In fact, the Atlanta Journal-Constitution stated in its motion to quash the reporter's subpoena that the reporter was recently shown the defendant's picture and he "cannot swear that the defendant is even the 'Bill Gulley' whom he reported on in 1992." Since there are insufficient circumstances of reliability regarding the article, we cannot conclude that the application of the hearsay rule was error.[7] See *Green*, 442 U. S. at 97; *Smith*, 270 Ga. at 249.

14. Gulley complains that the State's penalty phase closing argument was improper, but he made no objection to the State's argument at trial. When no objection is made to the State's closing argument in a death penalty trial, the test for reversible error is not whether the argument is objectionable, but whether the improper argument in reasonable probability " 'changed the jury's exercise of discretion in choosing between life imprisonment or death.' " *Hicks v. State*, 256 Ga. 715 (23) (352 SE2d 762) (1987), quoting *Ford v. State*, 255 Ga. 81 (8) (335 SE2d 567) (1985). See also *Mullins v. State*, 270 Ga. 450 (2) (511 SE2d 165) (1999). After review of the State's argument, we find no error sufficient to overcome Gulley's procedural default. See id.

15. Gulley's claim of error resulting from the refusal of State witness Curly Bell Swan to speak with the defense before trial is without merit. Witnesses cannot be compelled to submit to interviews with the defense. *Rutledge v. State*, 245 Ga. 768 (2) (267 SE2d 199) (1980).

16. Gulley objected at trial to a polygraph reference in his audiotaped statement. The statement was as follows:

Officer: Why did you rape Curly Bell?

---

[7] The jury did hear Gulley's claim that he saved the lives of two people in 1992. The trial court permitted the defense psychologist to testify that Gulley told him he had saved two lives in 1992 as part of his recitation of Gulley's mental health history used to support the diagnosis.

> Gulley: Why did I rape Curly Bell? Well, see, that guy right there, the one that gave me the polygraph test, he say I like older women. It wasn't about no older women . . .

Gulley objected to the unstipulated reference to a polygraph test and moved for a mistrial, which the trial court denied. We find that the trial court correctly denied the motion for mistrial. " '[T]he mere fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial *if* no inference as to the result is raised. . . .' [Cit.]" *Carr v. State*, 259 Ga. 318 (1) (380 SE2d 700) (1989), quoting *White v. State*, 255 Ga. 210 (6) (336 SE2d 777) (1985). Gulley's single, passing reference to a polygraph test raised no inference as to its result. We further note, as did the trial court, that before trial Gulley had a transcript of his statement, which was the subject of a motion to suppress and a *Jackson v. Denno* hearing, but he made no objection to the polygraph reference until the audiotaped statement was played for the jury.

17. The death sentence was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The cases listed in the Appendix support the imposition of the death penalty in this case as they involve a murder during the commission of a rape, armed robbery, burglary or kidnapping with bodily injury, OCGA § 17-10-30 (b) (2), or the aggravating circumstance involving torture, depravity of mind, or an aggravated battery. Id. at (b) (7).

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999); *Perkins v. State*, 269 Ga. 791 (505 SE2d 16) (1998); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *Williams v. State*, 258 Ga. 281 (368 SE2d 742) (1988); *Blankenship v. State*, 258 Ga. 43 (365 SE2d 265) (1988); *Lipham v. State*, 257 Ga. 808 (364 SE2d 840) (1988); *Ford v. State*, 255 Ga. 81 (335 SE2d 567) (1985); *Ross v. State*, 254 Ga. 22 (326 SE2d 194) (1985); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State*, 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *Krier v. State*, 249 Ga. 80 (287 SE2d 531) (1982); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981).

DECIDED JULY 8, 1999 —
RECONSIDERATION DENIED JULY 27, 1999.

*Thomas G. Ledford, John L. Tracy, Mark T. Phillips,* for appellant.

*Kenneth B. Hodges III, District Attorney, Tracia M. King, Kenneth A. Dasher, Assistant District Attorneys, David B. Hornsby, Assistant District Attorney, Clayton Circuit, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Patricia A. Burton, Assistant Attorney General,* for appellee.