## A08A2045. HAMILTON v. THE STATE.
### (676 SE2d 773)

ADAMS, Judge.

Pierre Hamilton was indicted for a single count of malice murder. A jury acquitted Hamilton of murder and of involuntary manslaughter based upon battery, but convicted him of voluntary manslaughter. Hamilton now appeals.

Viewed in the light most favorable to support the verdict, the evidence showed that in 2002, Hamilton was a frequent resident of the Super 8 motel on Cone Street in Atlanta. At around 4:30 or 5:00 p.m. on the afternoon of October 3, 2002, Michelle Johnson, the motel's housekeeping supervisor, saw Hamilton enter Room 518 of the motel with a young woman she later identified as Laura Pegues. The next morning, housekeeper Rose Samuels found Pegues' body lying on a housekeeping cart inside a supply closet on the fifth floor of the motel. Police observed that Pegues appeared to have been bludgeoned, and blood was dripping from her mouth and nose.

The medical examiner testified that Pegues was killed by strangulation, which he estimated from her injuries would have required at least four to five minutes of moderate, constant pressure on the carotid artery or trachea, and would have taken even longer, if the pressure was applied intermittently. She had marks on both sides of

her neck. The doctor also observed rows of bruising on her scalp, which were consistent, inter alia, with her being struck by the knuckles of a fist. In addition, she had a black eye and other abrasions that appeared to have occurred around the time of her death. The doctor testified that a person being strangled would have an "enormous amount of reaction," such that the person applying pressure to the victim's neck would know that they were cutting off the victim's air supply. Forensic analysis demonstrated that blood samples taken from Room 518 matched both Pegues' and Hamilton's blood, or that of their identical twins.

Approximately three weeks after Pegues' body was discovered, Hamilton appeared unexpectedly at the home of his friend, Levon Daniels. Hamilton told Daniels he had something he needed to talk about, but he was reluctant to tell Daniels what it was. Hamilton spent the night at Daniels' house. The next morning Hamilton told Daniels that he met Pegues that night and took her back to the motel with him. Daniels testified that "whenever they finished whatever it was they were doing," Hamilton decided to take a shower. When he came out of the bathroom, he discovered that $600 in cash was missing from his pants.

Hamilton accused Pegues of taking the money, and when she denied it, he became agitated. They began to struggle, and Hamilton put Pegues in a headlock and told her to tell him where the money was. They went around the room in this position looking for the money. He kept her in the headlock because she was struggling and he wanted to keep her from screaming. At some point, Pegues went limp, and he eventually located the money hidden in her vagina. When he realized she was dead, he paid someone money to help him clean the room and put Pegues' body on the cart. They took the body down the hallway and left it in the closet. Hamilton told Daniels that he did not mean to kill Pegues.

1. Hamilton first asserts that the trial court erred in admitting copies of the motel's lock interrogation log over his counsel's objection. Michelle Johnson, the housekeeping supervisor, testified that the motel kept lock interrogation logs in the regular course of its business. She said that each time someone used a key card to enter a guest room, the motel computer made a record of the card used and the time. The lock interrogation logs reflect these computerized entries, tracking when employees and guests enter a particular room. Hamilton objected at trial on the ground that Johnson was not the proper person to lay the foundation because she was the housekeeping supervisor, not the custodian of record.

But Johnson did not have to personally maintain the records in

order to lay a proper foundation for their admission:

> The business records exception does not require that the person laying the foundation for the admission of business records be the custodian of the records. Instead, it requires that the record offered to prove an act or transaction be made in the regular course of business and that it is the regular course of business to make the record at the time of the act or transaction.

(Punctuation and footnotes omitted.) *Neill v. State*, 247 Ga. App. 152, 153 (1) (543 SE2d 436) (2000). "The witness's lack of personal knowledge regarding how the records were created does not render them inadmissible, but merely affects the weight given to the evidence." (Footnote omitted.) *Santana v. State*, 283 Ga. App. 696, 698 (1) (642 SE2d 390) (2007). Johnson's testimony was sufficient to lay a proper foundation, and the logs were properly admitted. Id.

Although Hamilton also argues that the admission of this evidence violated his right to confront the witnesses against him, he raised no such objection at trial. The "failure to make a contemporaneous objection on the specific ground urged on appeal results in waiver." (Punctuation and footnote omitted.) *Moody v. State*, 279 Ga. App. 440, 444 (4) (631 SE2d 485) (2006). In any event, business records properly admitted under the "firmly rooted" hearsay exception do not violate "a defendant's right of confrontation under the Federal and State constitutions." *Brown v. State*, 268 Ga. 76, 81 (485 SE2d 486) (1997).

2. Hamilton next argues that the trial court erred when it denied his request to re-cross-examine Johnson after the State's re-direct. He asserts that he wanted to address Johnson's "new" testimony on re-direct that she was "confident" that the woman she saw enter Room 518 with Hamilton was the woman who was found dead the next day.

But in order "to preserve the right to complain about a ruling limiting cross-examination, a party must either ask the questions he desires to ask or state to the court what questions he desires to ask and then interpose timely objection to the ruling of the court denying him the right to propound the questions." (Punctuation and footnote omitted.) *Gober v. State*, 249 Ga. App. 168, 172 (3) (547 SE2d 656) (2001). Because Hamilton failed to follow this procedure, he waived his right to raise the issue on appeal. Moreover, Johnson had already testified on direct that she saw Hamilton and Pegues entering Room 518 the day before Pegues' body was discovered. Thus, Hamilton had the opportunity to cross-examine her on this subject, and no abuse of discretion occurred. See *Freeman v. State*, 257 Ga. App. 232, 234 (2) (570 SE2d 669) (2002).

3. Hamilton further contends that the trial court erred in failing to give the complete charge on accident he requested. The trial court, however, charged the jury on accident as defined under OCGA § 16-2-2. We conclude that when considered as a whole, the trial court's charge "covered the principle of law involved in the defendant's request, and the failure to charge in the exact language requested does not constitute reversible error." (Citation and punctuation omitted.) *Pennamon v. State*, 248 Ga. 611, 614 (3) (284 SE2d 403) (1981). See also *Fincher v. State*, 289 Ga. App. 64, 66 (1) (656 SE2d 216) (2007).

4. Hamilton argues that the trial court erred in denying his motion for a mistrial on the ground that the prosecutor twice mentioned in his argument that battery, upon which a jury verdict of involuntary manslaughter would be based, was a misdemeanor. Hamilton's counsel did not object at the time, and in his own closing he cautioned the jury not to consider punishment in reaching his verdict. In addition, the trial court charged the jury that they were not to concern themselves with punishment. Hamilton's counsel made his motion for a mistrial after the jury charge. The trial court denied the motion, because Hamilton did not make a contemporaneous objection and because the jury had been instructed to disregard sentencing. The trial judge asked whether Hamilton's counsel wanted curative instructions, but counsel replied that he merely wanted his motion granted.

After deliberations began, the jury asked to be re-charged on the definitions of malice murder, voluntary manslaughter and involuntary manslaughter. At this point, Hamilton's counsel did request curative instructions. In re-charging the jury, the trial judge specifically instructed the jury, at counsel's request, to disregard any reference to "misdemeanor" in the State's closing argument. Hamilton renewed his motion for a mistrial, and the judge called the jury back to instruct them, again at Hamilton's request, that all the offenses they were considering were felonies. The court also repeated its instruction that the jury not concern themselves with punishment. Afterward, Hamilton renewed his motion for a third time.

But "[a] defendant must object to the alleged impropriety at the time it occurs in order to afford the trial court the opportunity to take remedial action. The failure to do so generally results in a waiver of the defendant's right to urge the impropriety of the argument on appeal." (Citations and punctuation omitted.) *Mullins v. State*, 270 Ga. 450 (2) (511 SE2d 165) (1999). See also *Butler v. State*, 273 Ga. 380, 383-384 (8) (541 SE2d 653) (2001) (waiting until the end of closing argument to move for a mistrial was untimely). "When no timely objection is interposed, the test for reversible error is not simply whether or not the argument is objectionable, or even

if it might have contributed to the verdict; the test is whether the improper argument in reasonable probability changed the result of the trial." (Citation omitted.) *Todd v. State*, 261 Ga. 766, 767 (2) (a) (410 SE2d 725) (1991). See also *Ford v. State*, 255 Ga. 81, 90 (335 SE2d 567) (1985).

We cannot say that the prosecutor's argument in reasonable probability changed the result of the trial. The trial court twice instructed the jury not to consider punishment and further instructed them to disregard the objectionable portion of the State's argument. The court also honored Hamilton's request to inform the jury that all the charges in the case were felonies.

Moreover, "[s]o long as the court does not relate anything to the jury about possible sentences for the crimes charged, there is no error; and the use of the terms 'felony' and 'misdemeanor,' standing alone, does not amount to such an error." (Citations omitted.) *Quintana-Camporredondo v. State*, 275 Ga. App. 859, 861 (2) (622 SE2d 66) (2005). See also *Fletcher v. State*, 197 Ga. App. 112, 113 (3) (397 SE2d 605) (1990). And because neither the State nor the trial court said anything about possible sentences for the charged offenses, the issue of punishment was not improperly interjected into the jury's deliberations. *Bellamy v. State*, 272 Ga. 157, 159 (4) (527 SE2d 867) (2000).[1]

5. Hamilton asserts that the jury's verdict of voluntary manslaughter was incorrect because the evidence supported, at most, a finding of involuntary manslaughter. We disagree.

One commits the crime of voluntary manslaughter "when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a). Hamilton confessed to his friend that he had killed Pegues after he became agitated when she would not return his money. The issue of whether he intended to kill her was peculiarly a question for the jury,

> and a jury's finding on that issue will not be disturbed on appeal unless contrary to the evidence and clearly erroneous. Criminal intent rarely can be proved by direct evidence, but its existence may be inferred by the trier of fact upon consideration of the words, conduct, demeanor, motive, and

---

[1] Hamilton's claim that his counsel was ineffective for failing to object to this portion of the prosecutor's argument is also without merit, as Hamilton cannot establish that this omission prejudiced him. See *Jackson v. State*, 282 Ga. 494, 497 (2) (651 SE2d 702) (2007); *Anderson v. State*, 257 Ga. App. 602, 602-603 (2) (a) (571 SE2d 815) (2002).

52

all other circumstances connected with the act for which the accused is prosecuted. Additionally, a presumption exists that persons of sound mind and discretion intend the natural and probable consequences of their acts.

(Citations and punctuation omitted.) *McKibbons v. State*, 226 Ga. App. 452, 453 (1) (486 SE2d 679) (1997). We find that the evidence in this case was sufficient to support the jury's verdict of voluntary manslaughter beyond a reasonable doubt.

6. Hamilton contends that the trial court erred in denying his motion for new trial on the ground of ineffective assistance of trial counsel. We will affirm a trial court's finding that a defendant has not been denied effective assistance of trial counsel unless it is clearly erroneous. *Botelho v. State*, 268 Ga. App. 129, 132 (3) (601 SE2d 494) (2004). Moreover,

[t]he two-prong test for determining the validity of a claim of ineffective assistance of counsel provided in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different, but for counsel's deficiency.

(Footnote omitted.) *Bruce v. State*, 252 Ga. App. 494, 498 (2) (555 SE2d 819) (2001).

(a) Hamilton first argues that his counsel was ineffective in failing to object or move for a mistrial when the prosecutor stated in closing argument that defense counsel "needs you to misunderstand the law of reasonable doubt." He asserts that this was an impermissibly unflattering characterization of his trial counsel. At the hearing on the motion for new trial, Hamilton's trial attorney testified that he thought it was a fair argument and explained that in general he believed that objecting during closing argument could pose a risk "unless you can get the judge to sustain you and embarrass the prosecutor." Otherwise, an overruled objection could hurt the lawyer's credibility and ultimately hurt the client.

"In general, [such] matters of reasonable trial strategy and tactics do not amount to ineffective assistance of counsel." (Citation and punctuation omitted.) *Jackson v. State*, 281 Ga. 705, 708 (6) (642 SE2d 656) (2007). "The fact that [Hamilton] and his . . . present counsel now disagree with the difficult decisions regarding trial tactics and strategy made by trial counsel does not require a finding that [Hamilton] received representation amounting to ineffective assistance of counsel." (Citation and punctuation omitted.) *Muller v.*

*State*, 284 Ga. 70, 73-74 (3) (663 SE2d 206) (2008). Accordingly, Hamilton cannot establish ineffective assistance of trial counsel on this ground.

(b) Hamilton asserts that his trial counsel was also ineffective in advising him not to testify on his own behalf.

The trial judge questioned Hamilton on the record about his decision not to testify. She asked him whether he had had time to confer with his attorney, and whether he had in fact done so. She also told him that he did not have to testify, but that it was his decision whether he wanted to testify. Hamilton indicated that he understood and that he had sufficient time to confer with his attorney. He then indicated that he had reached the decision not to testify.

Moreover, his attorney testified at the hearing on the motion for new trial that he did not recall that Hamilton ever wanted to testify. Hamilton told him that two other men killed Pegues. The attorney pointed out that they did not know who the other two men were and that the evidence did not really support that defense since he was seen going into the room with Pegues and both her blood and his were found there. The attorney told Hamilton that he did not think that such a defense would be "a good one to put before the jury." He also advised Hamilton of the potential issues he would face on cross-examination in light of the evidence, but the lawyer said he did not force him not to testify.

At the hearing, Hamilton said that he wanted to testify at trial, but his attorney advised against it. He said that he wanted to tell the truth on the stand and explain that he did not mean to kill Pegues. He would also say that Pegues already had the black eye and the bruises when he met her that night. Nevertheless, he admitted that he had lied to his trial attorney and told him that two other men had killed her.

Although Hamilton said he told his attorney he wanted to testify, he admits that he lied to him about the circumstances of Pegues' death. In view of this lie, his attorney advised him not to testify because the evidence did not support his story. Accordingly, trial counsel's advice to Hamilton "was tactical in nature." *Wroge v. State*, 278 Ga. App. 753, 756 (2) (629 SE2d 596) (2006). And although Hamilton apparently now regrets his decision not to testify, his attorney's advice was based upon misinformation Hamilton provided and under these circumstances, "he cannot complain of his own election to follow the reasonable tactical advice of his lawyer." (Citations and punctuation omitted.) *Todd v. State*, 275 Ga. App. 459, 464 (4) (620 SE2d 666) (2005). Accordingly, his claim on this ground is without merit.

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED MARCH 26, 2009.

*Charles H. Frier*, for appellant.

*Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Assistant District Attorney*, for appellee.